## Case No. 12,165.

### RUSSELL et al. v. WIGGIN et al.

[2 Story, 213; [1] 5 Law Rep. 533.]

Circuit Court, D. Massachusetts. May Term, 1842.

BILLS OF EXCHANGE—PROMISE TO ACCEPT—LETTER OF CREDIT—LEX LOCI CONTRACTUS—DAMAGES.

1. By the law of England, it seems, that a promise to accept a non-existing bill of exchange, even though it be taken by the holder upon the faith of that promise, does not amount to an acceptance of the bill, when drawn in favor of the holder. But it has been held otherwise by the supreme court of the United States.

[Cited in note in Payson v. Coolidge, Case No. 10,860. Cited in brief in National Bank v. Millard, 10 Wall. (77 U. S.) 154. Cited in Morse v. Massachusetts Nat. Bank, Case No. 9,857.]

[Cited in Pollock v. Helm, 54 Miss. 1.]

2. A promise contained in a letter of credit, written by persons who are ·to become the drawees of bills drawn under it, promising to accept such bills when drawn, which letter is designed to be exhibited for the purpose of inducing persons to advance money on it and take the bills when drawn, is an available contract in favor of the persons, to whom the letter of credit is shown, who advance money and take the bills on the faith thereof.

[Cited in Barney v. Newcomb, 9 Cush. 53; Evansville Bank v. Kaufman, 93 N. Y. 285; Exchange Bank v. Rice, 98 Mass. 292, 293; First Nat. Bank v. Clark, 61 Md. 407; Lafargue v. Harrison, 70 Cal. 389, 11 Pac. 636; Lonsdale v. Lafayette Bank, 18 Ohio, 141; Nelson v. First Nat. Bank, 48 Ill. 40; Pollock v. Helm, 54 Miss. 1; Valle v. Cerre, 36 Mo. 591; Franklin Bank of Baltimore v. Lynch, 52 Md. 276; Whilden v. Merchants' & Planters' Nat. Bank, 64 Ala. 1.]

3. A. of Boston, the agent of a banking house in London, gave a letter of credit to B. authorizing C. who was about to proceed to the East Indies, to value on the said bankers to a certain amount, engaging that the bills should be duly honored when presented; B. at the same time made the usual arrangement to remit to the said bankers in London sufficient funds to meet the payment of all bills which might be drawn by virtue of the said credit; but failed to do so. The said letter of credit was taken to Manila by C. to procure a cargo, and the plaintiffs, on the strength of the letter, furnished a cargo and received from C. bills on the said bankers to the amount limited in the said letter of credit. Most of the bills so drawn, were paid at maturity; others were protested for non-acceptance and for non-payment, and were returned to Manila, and paid by the plaintiffs, who were also obliged to pay and did pay more than one re-exchange. It was *held*: that the said letter of credit was to be deemed to be made in Massachusetts, and as to its obligation, construction and character, was to be governed by the laws of Massachusetts, and not by the laws of England.

[Cited in Exchange Bank v. Hubbard, 10 C. C. A. 295, 62 Fed. 114.]

[Cited in brief in City of Aurora v. West, 22 Ind. 512. Cited in Goodsell v. Benson, 13 R. I. 234; Kupfer v. Bank of Galena, 34 Ill. 350.]

4. The plaintiffs were entitled to maintain an action against the said bankers, and to recover the amount of the damages sustained by the refusal of the defendants to accept the bills.

[Cited in Cassel v. Dows. Case No. 2,502; Pendleton v. Knickerbocker Life Ins. Co., 7 Fed. 172.]

[Cited in Franklin Bank of Baltimore v. Lynch, 52 Md. 276.]

5. The plaintiffs were entitled to recover the whole damages, costs, and expenses paid by them, including re-exchange, with interest of the place where the money was payable by the plaintiffs.

[Cited in Lodge v. Spooner, 8 Gray, 168.] ·

Assumpsit [by George R. Russell and others against Timothy Wiggin and others]. The declaration contained a count, upon a promise to accept certain bills of exchange stated therein; and also the money counts. The cause came before the court upon the following agreed state of facts:

On the fourth day of November, 1835, the defendants granted to Ebenezer Breed a letter of credit, of which the following is a copy: "Boston, Nov. 4, 1835. I hereby authorize Mr. William P. Endicott of barque Palinure to value on Messrs. T. Wiggin & Co., London, at six months' sight at any place in India, for account of Ebenezer Breed, Esq.. of Charlestown, for any sums, not exceeding in all fifteen thousand pounds sterling. And I hereby engage, as the authorized agent of Messrs. T. Wiggin & Co., that the bills of Mr. Endicott shall be duly honored when presented, if drawn within twelve months from the date of this letter. In case of any accident, by which Mr. Endicott may be prevented from using this credit, I hereby authorize Captain Robert Henderson, Jr., of said barque, to use the same for account of Mr. Breed, for £15,000 sterling. (Signed) Robert Hooper, Jr., Agent, to T. Wiggin & Co." At the same time, Breed signed and gave to Hooper a contract of which the following is a copy: "Boston. Nov. 4. 1835. Mr. Robert Hooper, Jr.. on behalf of Messrs. T. Wiggin & Co., of London, having at this date opened a credit on said T. Wiggin & Co.. for my account, to be used in India by William P. Endicott, Capt. Robert Henderson, Jr., of barque Palinure, to the extent of fifteen thousand pounds sterling. In consideration thereof, I hereby agree to remit to T. Wiggin & Co., in London, suf-

---

1 [Reported by William W. Story, Esq.]

ficient funds to meet the payment of all bills, which may be drawn by virtue of this credit, together with all charges on the same. I further agree with said T. Wiggin & Co., to give security here to the satisfaction of their agent, to the amount of fifteen thousand pounds sterling, at any time when required by them or their agent. (Signed) Eben. Breed." Letters of credit, so issued, were always accompanied by an engagement on the part of the person for whose account the credit was issued, to remit funds to the banker in London, in season to meet the bills, which should be drawn under the credit, unless the merchandise purchased was by the terms of the credit, to be shipped to the banker or his agent: such letters of credit being at that time never based on funds of the party receiving it, actually in the hands of the banker. Afterwards, the said Endicott proceeded in the said vessel to India, and wishing to procure a cargo at Manilla, consigned his vessel to the plaintiffs, then doing business there, exhibited and delivered to them the said letter of credit, and proposed to them to furnish a cargo, and receive bills on the defendants, drawn under the said letter;—and the plaintiffs, relying on the commercial standing of the defendants, and on their promise contained in said letter, agreed to, and did furnish a cargo for the vessel, and received bills on the defendants to the amount of £15,000 drawn payable in six months after sight, on account thereof. The bills so drawn were payable to the order of the plaintiffs, and were indorsed and negotiated by them as opportunities offered.

Mr. Breed failed in June, 1837, not having performed his contract aforesaid. Most of the bills so drawn, were accepted on presentation, and paid at maturity. One drawn Oct. 29th, 1836, for £373 3s. 6d., reached London by the way of Spain, was accepted on presentment, April 22d, 1837, was not paid at maturity, was duly protested for non-payment, and returned to Manilla by the same route, where it arrived in July, 1838, and was taken up and paid by the plaintiffs, February 11th, 1839; the principal, with reëxchange, damages, and interest, paid by them, amounting to the sum of $2,528.20. One drawn Oct. 29th, 1836, for £273 10s., reached London by the way of Cadiz, was accepted April 25th, 1837, not paid at maturity, protested for non-payment, and returned to Manilla by same route, where it arrived July, 1838, and was taken up by the plaintiffs, Nov., 1839, who paid the principal, damages, &c., $1,692.93. Two dated Nov. 3d, 1836, one for £436 15s. 6d., and one for £300, reached London by the way of Spain, were presented for acceptance, June 27th, 1837, protested for non-acceptance, and afterwards for non-payment, were returned to Manilla by the same route, where they arrived in June, 1838, and were paid with re-exchange, &c., in July and November, 1839, amount $4,865.77. One dated November 2d, 1837, for £407 11s., reached London by the way of Spain, and was presented for acceptance and protested for non-accept-

ance, June 12th, 1837, and for non-payment, December 15th, was returned by the same route, and the plaintiffs paid it, February 20th, 1839, $2,863.67. One dated November 3d, 1836, was presented in London, and protested for non-acceptance, July 4th, 1837, and for non-payment, January 6th, 1838, and was returned to Manilla September 1st, 1838, and paid by the plaintiffs in February, 1839, $558.34. The plaintiffs resisted payment of more than one re-exchange from London, and a suit was brought in a similar case at Manilla, the decision of which the holders of the bills and the plaintiffs agreed to abide; the decision was in favor of the holders of the bills, and the plaintiffs paid accordingly. The plaintiffs were duly notified of the dishonor of the bills. The defendants admit their liability on the two accepted bills for the face thereof, and the costs of protest and interest at the rate of 5 per cent. per annum; the plaintiffs claim also damages, and re-exchange they were obliged to pay. The defendants deny all liability on the non-accepted bills; the plaintiffs claim the whole amount paid by them on account thereof, with interest, at the rate of —— per cent. The bills, protests, a copy of the record of the Spanish case referred to, and the laws of Spain, may be referred to by either party. The trustee admits assets. The parties agree, that the opinions of Sir William Follett, Sir Frederick Pollock, and Mr. M. D. Hill, upon certain questions of law submitted by the defendants' counsel, may be used upon the hearing of this case, in the same manner as if taken under a commission duly issued; but the plaintiffs do not by this consent waive any other objections to such testimony. The legal rate of interest at Manilla is six per cent. The plaintiffs had no actual knowledge of the above contract signed by Breed, nor his business relations with the defendants, except from the letter of credit, and no notice thereof, unless it is implied by law from the course of business. If the court shall be of opinion, that the plaintiffs are entitled to recover the whole or any part of their claim in this action, judgment shall be rendered accordingly; otherwise they shall be non-suited, costs to follow the result.

The facts in the case were submitted to eminent lawyers in England, upon the following questions stated: (1) By the law of England, do the letter of credit and the acts of the parties above stated create any contract between Russell, Sturgis & Co. and T. Wiggin & Co., to accept the bills drawn under the letter of credit? (2) By the law of England, could Russell, Sturgis & Co., upon the facts above stated, maintain any action against T. Wiggin & Co., founded on the said letter of credit, and if not, why not? (3) By the law of England, is a promise in writing, to accept a non-existing foreign bill drawn so as to be payable in six months after sight, equivalent to an acceptance, where the payee takes such bill on the faith of the written promise of the drawee to accept it? (4) By the law of Eng-

land, what damages, if any, would T. Wiggin & Co. be liable for to Russell, Sturgis & Co., upon the bills above mentioned, which were accepted by them, and protested for non-payment? (5) By the law of England, what damages, if any, would T. Wiggin & Co. be liable for to Russell, Sturgis & Co., upon the bills above mentioned, which were protested for non-acceptance?

## Opinion of Sir William Follett and Sir John Bayley.

We are of opinion, that the letter of credit and the acts of the parties above stated, do not, by the law of England, create any contract between Russell, Sturgis & Co. and T. Wiggin & Co., to accept the bills drawn under that letter of credit. We are of opinion, that Russell, Sturgis & Co. could not, by the law of England, upon the facts above stated, maintain any action against T. Wiggin & Co., founded on the said letter of credit, because there is no privity of contract, or consideration moving between them. We are of opinion, that a promise in writing to accept a non-existing foreign bill, is not, under the circumstances stated, by the law of England, equivalent to an acceptance. The damages to which T. Wiggin & Co. would be liable to Russell, Sturgis & Co., by the law of England, for non-payment of bills accepted by them, would be the amount of principal, interest and expense of protest on each bill. But T. Wiggin & Co. would not be liable by the law of England to Russell, Sturgis & Co. for any damages upon bills which they did not accept. W. Follett. John Bayley. Temple, 9th April, 1842.

## Opinion of Sir Frederic Pollock.

(1) I am of opinion, that according to the law of England, no contract was created between Russell, Sturgis & Co. and T. Wiggin & Co., to accept the bills drawn under the letter of credit in consequence of the letter of credit and the acts of the parties. (2) Nor could Russell, Sturgis & Co., upon the facts above stated, maintain any action founded on the letter of credit against T. Wiggin & Co. The reason is, that Russell, Sturgis & Co., are not parties to the contract. (3) According to the law of England, a promise in writing to accept a non-existing bill is not equivalent to an acceptance of it. It is merely a contract made by the party promising to the party to whom the promise is made. (4) The damages to be recovered from the drawer and indorsers, in the case of an accepted foreign bill, being dishonored, protested and returned, depend upon the usages of the place where the bill is dishonored, which I believe vary very much, but as against the acceptor, nothing is recoverable but the amount of the bill and interest. (5) As to the unaccepted bills, T. Wiggin & Co. would not be liable at all to Russell, Sturgis & Co. Fred. Pollock. Temple, 5th April, 1842.

## Opinion of M. D. Hill.

(1, 2, & 3) I am of opinion, by the law of England, the letter of credit and the agreement would not constitute an acceptance of non-existent foreign bills of exchange. But this point, I apprehend, must be determined according to the lex loci contractus, and I have reason to doubt, whether the law of the United States agrees with ours on this question. If the case of Coolidge v. Payson, 2 Wheat. [15 U. S. 66], in the supreme court of the United States, be law in this country, the letter of credit operated as an acceptance, according to American law; but that case was decided entirely on the English cases, which are not considered here as authority to the intent required. If, however, the letter of credit and agreement do not amount to acceptance, I see nothing in these documents and the acts of the parties to raise a contract to accept, between Russell, Sturgis & Co. and T. Wiggin & Co., Russell & Co. not being any party to the contract between T. Wiggin & Co. and Breed. (4 and 5) Such losses as Russell & Co. were, without any fault of their own, compelled to sustain, will furnish the measure of damages in both cases. With respect to the bills protested for non-acceptance, and then returned to Manilla, and afterwards sent again to England for payment, if Russell, Sturgis & Co. can recover at all, I think they must recover according to the principle on which the court at Manilla acted; for even if that decision was wrong, still it was a decision binding on Russell, Sturgis & Co., and has wrought a damage to them, immediately flowing from the misconduct of T. Wiggin & Co. M. D. Hill. Chancery Lane, Nov. 31, 1842.

C. G. Loring and F. C. Loring, for plaintiffs.

Charles P. Curtis, for defendants.

The argument for the plaintiffs was as follows:

The general facts of the case make a prima facie case for the plaintiffs. The grounds of the defence are understood to be, 1st, that Breed did not keep his contract with the defendants, and, therefore, they are not bound to honor the bills; 2d, that there is no privity between the parties to this suit.

As to the first question, if Breed did not perform his contract, the defendants had the power to enforce performance, or obtain security. Having neglected to exercise this power, the loss should fall upon them, and not upon an innocent party. If the plaintiffs had knowledge of this contract, it would not alter the case: 1st, because its performance was not made a condition precedent to the honoring of the bills; 2d, because they could not know whether it was performed or not; 3d, because, in fact, there had been no breach committed when they received the bills; and 4th, because it was a contract between Breed and the defendants exclusively. But the case finds, that they did not know of its existence.

With regard to the second question, we say, that a privity of contract did exist between the parties. To this contract, Breed and the defendants certainly were parties; and the question now is, whether or not the plaintiffs are also parties. The letter of credit purports to be an engagement, that the bills drawn under it should be honored. It was the intention of both parties, that it should be carried to India, and shown to persons there, who would thereby be induced to receive the bills to be drawn under it, in payment for goods furnished. This is the definition of a letter of credit. Beaw. Lex Mer. pl. 470; 3 Chit. Com. & Man. 336. If this be not admitted, it must be inferred from the terms of the letter; it not being addressed to Breed, but being an open letter; and from the usage of merchants; and because it would have been wholly useless to Breed, if it were not to be shown to others. If the letter had been addressed to the plaintiffs, by name, it will not be denied, that it would constitute an express promise to them to honor the bills, for the breach of which, the defendants would be liable to them in damages. Nor does the fact, that they are not named in it, but that it is an open letter, make any difference. It is not essential to a contract, that all the parties should be named in it; or that they should be known, or even be in existence, when it is made. Thus, where a reward is offered for the discovery of thieves, there is no contract with any one in particular; but any person giving the desired information, may claim the reward, and may maintain an action for it. Chit. Cont. p. 10, note 9; City Bank v. Bangs, 2 Edw. Ch. 95; Williams v. Carwardine 5 Car. & P. 566; Lancaster v. Walsh, 4 Mees. & W. 16. So, in cases of trusts created for the benefit of creditors, it is not usual to mention them by name, but any one of that character may become a party to the contract. So, in cases of marriage settlements, where trusts are created for the benefit of children to be born. This contract has grown out of the usages of trade, and the necessities of merchants, and its utility would be greatly impaired, if it were necessary to address it to a particular house. Such a contract has been well defined by Chief Justice Marshall as an "assumpsit to the world, entitling any one, who acts upon the faith of it, to an action."

In this country, the question, whether this action can be maintained, can hardly be considered an open one. Duval v. Trask, 12 Mass. 154; Carnegie v. Morrison, 2 Metc. [Mass.] 381; Ontario Bank v. Worthington, 12 Wend. 593; Goodrich v. Gordon, 15 Johns. 6; McKim v. Smith, 1 Hall's Law J. 486; Lawrason v. Mason, 3 Cranch. [7 U. S.] 493; Schimmelpennich v. Bayard, 1 Pet. [26 U. S.] 264; Townley v. Sumrall, 2 Pet. [27 U. S.] 170; Bryce v. Edwards, 4 Pet. [29 U. S.] 111; Edmonston v. Drake, 5 Pet. [30 U. S.] 624; Adams v. Jones, 12 Pet. [37 U. S.] 207;

Wallace v. Agry [Case No. 17,096]; Wildes v. Savage [Id. 17,653]; Baring v. Lyman, [Id. 983]. But it will be argued, that the contract was to be performed in England, and is to be construed by the English law; and by that law, there is no privity of contract between the parties; and to prove this, the opinions of eminent English counsel are produced. This presents two questions: 1st, What is the law in England on this subject? 2d, If it be different from the law here, is it to govern this contract? There is not a decision to be found in the English reports, nor even a dictum, to the effect, that an action will not lie against a party promising to honor a bill in favor of one, who takes it on the faith of that promise. Whenever the question has been suggested, a contrary opinion has been expressed. Beaw. Lex Mer. 444, pl. 112; Id. 470, pl. 245; Miln v. Prest, Holt. N. P. 181; Byles, Bills 108; Chit. Bills, 313; 3 Chit. Com. & Man. 336; Mont. Prec. 450; Bouv. Law Dict.; Fell, Guar. c. 3, pls. 17, 18, 22; Coleman v. Upcot, 5 Vin. Abr. 527, pl. 17; Bayley, Bills (5th Ed. Boston, 1836) p. 167. This is better evidence of what the law is, than the opinions of counsel, however eminent. They are not the best evidence the case admits of.

But if it were shown, that this action, in its present form, could not be maintained in England, two questions remain: 1st, Whether this contract is to be governed by the laws of England, or of this state, where it was made; and 2d, whether the plaintiffs would be without any remedy in England. The first question is most elaborately discussed in the case of Carnegie v. Morrison, 2 Metc. [Mass.] 381, and the decision is, in point, in favor of the plaintiffs. As to the second question, there can be no doubt, but that the plaintiffs might obtain a remedy, in some other form, in England. They might maintain an action on the case for a deceit, alleging, that the defendants made this contract with Breed, with the intent, that it should be shown to the plaintiffs, and they be thereby induced to trust him; and that they did so, and that defendants neglected to perform their contract; and it would not be material, that the promise or representation was not made to the plaintiffs directly. Foster v. Charles, 7 Bing. 105; Corbett v. Brown, 8 Bing. 33; Polhill v. Walter, 3 Barn. & Adol. 114. Or a remedy might be obtained in equity, on the same ground of a constructive fraud (1 Story, Eq. Jur. p. 384); or for a specific performance of the contract (2 Story. Eq. Jur. c. 18); or on the ground of an equitable assignment of funds in the defendants' hands, of which the letter of credit is an admission (Id. pp. 1041–1047). If then, in England, at law or in equity, the plaintiffs might recover damages or obtain relief for the breach of this contract, the laws of England recognize its obligation. Whether that remedy should be enforced at law, or in equity, by an action of assumpsit, or on the case, is

to be determined by the lex fori, and by the lex fori, it is admitted, this action may be maintained.

The plaintiffs claim as damages the amount of all the bills dishonored by non-payment, whether accepted or not, with the re-exchange paid by them, and interest. The contract of the defendants was to honor the bills; which contract was not performed by accepting, and afterwards refusing payment. The plaintiffs are entitled to recover all the damage they suffered by the breach of the contract; which includes the re-exchange paid on the accepted bills; and they are not to be considered merely as holders of those bills. Riggs v. Lindsay, 7 Cranch [11 U. S.] 500.

C. P. Curtis, for defendants, stated, that he should rely on several well-settled principles of the law of contracts, which he thought would entitle the defendants to a judgment in their favor. The contract, relied on by the plaintiffs in this case, was that of November 4, 1835; by which the defendants authorized the agent of Mr. Breed to value (or draw) on them, in London, for not exceeding £15,000, and engaging that bills, drawn in conformity to the terms of that instrument, should be duly honored; that is, accepted and paid. The acts to be done by the defendants, according to said contract, were to be performed in England; namely, to accept and pay bills of exchange. That is the place of the performance of this contract. By the law of that place, and not by the law of Massachusetts, where the contract was entered into, is the contract to be governed. Where a contract is, expressly or tacitly, to be performed in any other place than where it was made, the general rule is, in conformity with the presumed intention of the parties, that the contract, as to its validity, nature, obligation, and interpretation, is to be governed by the law of the place of performance. Story, Confl. Laws, p. 280; Andrews v. Pond, 13 Pet. [38 U. S.] 65; Prentiss v. Savage, 13 Mass. 20. If a contract is to be executed in a foreign country, the place of the making of it is immaterial. Fanning v. Consequa, 17 Johns. 518. No act whatever was to be performed under the contract in this case, in Massachusetts. It was to be sent immediately to the East Indies, and it was only bills drawn in India, that the defendants engaged to honor; and these, no where but in London. This is a clear case of a contract made here, but to be executed in a foreign country. It looks, then, to the foreign law for its validity and interpretation. But what foreign law is to govern it; that of India, or of England? So far as relates to the defendants, the latter. All that they obligate themselves to do, is to be done in England. If it were a question, by what law the drawer or indorsers of the bills in question were to be governed, it would require a different answer. They are presumed to contract with reference to the law where their contracts were to be performed; namely, in India. If the law of

England is to govern, as to the interpretation, nature, validity, and obligation of the defendants' contract, the next inquiry is, what is the law of that country in reference to such an instrument as constitutes the basis of this suit? The unwritten law of a foreign country is a fact to be proved by the opinions of judges and learned lawyers. Story, Confl. Laws, p. 638. For the purpose of showing, what the law of England is, we produce the opinions in writing of four of the most learned counsel at the English bar; Sir William Follett, Sir John Bayley, Sir Frederic Pollock, and Mr. Matthew Davenport Hill. They all concur in the opinion, that, by the law of England, the letter of credit, and the acts of the parties, do not create any contract between Wiggin & Co. and Russell, Sturgis & Co., to accept bills drawn under that letter; and that R. S. & Co. could not maintain in England any action against these defendants, founded on the said letter, for want of privity, or consideration passing between them. This evidence is uncontradicted, notwithstanding there has been ample time for the plaintiffs to procure the testimony or opinions of other learned counsel in England, if there were any doubt as to the accuracy and soundness of those produced by defendants. We must take it, then, to be the law of the place of the performance of this contract—which is the law of the contract—that the plaintiffs have no legal demand against the defendants in that country; and, therefore, as this court is to be governed by the law of that country, as to the validity and obligation of the contract, it seems to follow, of course, that they have no legal demand against the defendants here. If the premises are well founded, the conclusion seems to be irresistible. Most, or many of the authorities, cited by the plaintiffs' counsel, relate to the point, that a promise in writing to accept a non-existing bill, if shown to a third person, who takes the bill on the faith of such promise, is, in effect, an acceptance of the bill, and may be availed of as such by any subsequent holder of the bill. The authorities show this to be the law of the United States; but it is not the law of England, by which law this case is to be governed in this particular, as well as the former. Johnson v. Collings, 1 East. 98; Ex parte Bolton, 3 Mont. & A. 367. The opinions of Sir W. Follett and the others, are explicit on the point, that such a promise in writing is not equivalent to an acceptance, though the bill be taken on the faith of it. Qua cunque via data, therefore, the plaintiffs cannot prevail, if the law of England is the law of this contract.[2] That it is so, we have shown by the authorities before cited.

STORY, Circuit Justice. This cause has been very ably argued. There is no count in

---

[2] The views of the learned gentlemen, whose opinions are given above, have been confirmed by the court of exchequer in the recent case of Bank of Ireland v. Archer, 11 Mees. & W. 383.

the declaration upon any accepted bill of exchange; and, therefore, the whole class of authorities, English and American, so far as respects their direct bearing upon the question, whether a promise to accept a non-existing bill amounts to a positive acceptance thereof, when drawn, in favor of a holder, who takes the bill upon the faith of such promise, may be at once dismissed from our consideration, although they certainly must have a very forcible bearing upon one of the questions actually raised in the present case. In the case of Wildes v. Savage [Case No. 17,653], I had occasion to consider those authorities somewhat at large; and the result was, that although the English authorities might not now be deemed fully to support the doctrine, that such a promise would under such circumstances amount to an acceptance; yet the American were direct and positive to the purpose. Indeed, although there seems little doubt, what is the present inclination of opinion in England, yet there is no pretence to say, that there is any positive adjudication in England, in opposition to the doctrine; and I may add, that in one of the latest cases, in which the subject came before the court, that eminent commercial lawyer, Lord Chief Justice Gibbs, seemed to entertain an opinion directly in favor of the American doctrine; and he distinguished the case before him on that point upon the peculiar facts. Miln v. Prest, 4 Camp. 393, 1 Holt, N. P. 181. And it would be no matter of surprise to me, that if the doctrine contended for at the present argument, should be established to be the law in England (as it is affirmed by Sir Frederic Pollock and Sir William Follett, and the other learned gentlemen, whose opinions have been produced at the argument), that a promise to accept a bill would create no contract, except between the drawer and the promisor, although shown, and designed to be shown to induce the holder to take it, upon the ground of a want of privity between the holder and the promisor; I say, it would be no matter of surprise to me, that the courts of England should, whenever the question shall again arise, go back to the doctrine of Lord Mansfield in Pillans v. Van Mierop, 3 Burrows, 1663, and Pierson v. Dunlop, 2 Cowp. 571, as founded in a wholesome, nay, necessary justice, to prevent gross frauds, and manifest and irretrievable mischiefs in the intercourse of the commercial world.

There are two questions properly arising upon the state of facts presented to this court. The first is: Where is the contract of the defendants to be deemed to be made? Or, in other words, is it, as to its obligation, construction and character, to be governed by the law of Massachusetts, where it was signed and executed by the agent of the defendants? Or, is it to be deemed a contract made in England, where the acceptance was to be made; in which case, it is to be governed, in the like particulars, by the law of England, assuming that law to differ from the law of Massachusetts? The second question is: Whether a promise, contained in a letter of credit, written by persons, who are to become the drawees of bills drawn under it, promising to accept such bills when drawn, which letter, although addressed to the persons, who are to be the drawers of the bills, is designed to be shown to any and all person or persons whatsoever, to induce them to advance money on, and take the bills, when drawn, will be an available contract in favor of the persons, to whom the letter of credit is shown, who advance money and take the bills on the faith thereof, or is void for want of privity between them and the persons writing the letter of credit? I cannot say, that I entertain any serious doubts as to either question. As to the first, the letter of credit was executed in Boston, by the agent of the defendants, with full authority for the purpose; and it is, to all intents and purposes, the same, in legal effect, as if it had been there personally signed by the defendants themselves. It then created an immediate contract between the parties, in Boston, and it is to be governed, as to its obligation, construction, and character, by the law of Massachusetts, and not by the law of England; if, indeed, there be any distinction between them on this subject, which I am very far from believing there is. The contract was clearly valid and binding by the law of Massachusetts. It is true, that the contract is, to accept bills drawn on the defendants in London, and of course, the acceptance is there to be made. But that does not make it less obligatory upon the defendants to fulfil their promise to accept, although the acceptance, in order to be valid, must be made according to the requirements of the English law. Suppose a like letter of credit were executed in Boston, to accept bills payable in Paris in France, where an acceptance, to be binding, must be in writing, (although, by our law, it may be verbal,) there can be no doubt, that, unless there was a written acceptance in Paris, no remedy could be had upon any bill drawn in pursuance of the letter of credit, as an accepted bill. But there is as little doubt, upon principles of international law and public justice, that, in such a case, the contract, being made in Massachusetts, and being valid by the laws thereof, would be, and ought to be, held valid in all judicial tribunals throughout the world, and enforced equally in France, in England, and America, as a subsisting contract, the breach of which would entitle the injured party to complete redress for all the damage sustained by him. The case of Carnegie v. Morrison, 2 Metc. [Mass.] 381, is directly in point, upon this very question; and I entirely concur in that decision.

The second question, is one, upon which, until I heard the present argument, I did not suppose that any real doubt could be raised, as to the law, either in England or America.

I cannot but persuade myself, that the doctrine of both countries, as far as this question is concerned, is coincident, notwithstanding the opinions of the learned counsel, which have been brought to the notice of the court upon the present occasion, (and for which, certainly, I feel an unaffected respect and deference), and which assert, that the English doctrine denies all redress, under the circumstances, to the holder of the bills, and confines the whole remedial redress to an action between the drawers and the drawees of the bills, upon the ground, that there is a want of privity between the drawees and the person, who takes the bills, as purchaser, or holder. The case of Marchington v. Vernon, cited in a note to 1 Bos. & P. 101, before Mr. Justice Buller, seems to me fully to support the contrary doctrine.

Assuming, however, that there is a total want of privity between the parties in the present suit, the conclusion, to which these learned jurists have arrived, may be admitted fairly to follow as a result of the doctrine of the common law, although I entertain great doubt, whether, under such circumstances, a court of equity would not, and ought not, to administer complete relief, as a case of constructive fraud upon third persons. But my difficulty is in the assumption, that, in the present case, there is no privity of contract between the plaintiffs and the defendants. It appears to me, that this is an inference not justly deducible from the facts; and I know of no authority in English jurisprudence, which countenances, far less any, which establishes it, under circumstances like the present. On the contrary, I have understood, and always supposed, that, in the commercial world, letters of credit of this character were treated as in the nature of negotiable instruments; and that the party, giving such a letter, held himself out to all persons, who should advance money on bills drawn under the same, and upon the faith thereof, as contracting with them an obligation to accept and pay the bills. And I confess myself totally unable to comprehend, how, upon any other understanding, these instruments could ever possess any general circulation and credit in the commercial world. No man is ever supposed to advance money upon such a letter of credit, upon the mere credit of the party, to whom the letter is given; and I venture to affirm, that no man ever took bills on the faith of such a letter, without a distinct belief, that the drawee was bound to him to accept the bills, when drawn, without any reference to any change of circumstances, which might occur in the intermediate time between the giving of the letter of credit and the drawing of the bills under the same, of which the holder, advancing the money, had no notice. Any other supposition would make the letter of credit no security at all, or, at best, a mere contingent security, and the

money would, in effect, be advanced mainly upon the credit of the drawer of the bills, which appears to me to be at war with the whole objects, for which letters of credit are given. Let me state one or two cases to illustrate the doctrine, which, it seems to me, is applicable to letters of this sort. Suppose the present letter of credit had contained an express clause, by which the defendants should directly promise any and all persons, who should advance money and take bills on the faith thereof, that they would accept and pay the bills, so drawn, in their favor; can there be any doubt, that the promise would be available in favor of the persons making such advances, and create a direct privity of contract between them and the person who gave the letter of credit? If there could be no doubt in such a case, then it seems to me, that the circumstances of the present case, and, indeed, of all cases of letters of credit of a similar character, do naturally and necessarily embody an implied promise to the same extent, and, therefore, ought to be governed by the same rule; for there can, in the intendment of the law, be no just distinction between cases of an express promise and cases of an implied promise, applicable to transactions of this sort. Again, suppose, when the plaintiffs were about to advance their money on their bills, with the letter of credit before them, a partner, or authorized agent, of the firm of Wiggin & Co. had stood by, and said, "Take these bills on the faith of this letter of credit, and our house will duly accept and pay them," and, upon the faith of that statement, the money was advanced, and the bill was taken, could there be a doubt, that there would be a privity of contract created directly between the plaintiffs and the defendants, and that they might compel the defendants to accept and pay the bills, or indemnify them for the breach thereof? And yet, stripped of its mere external form, that is the very case before the court. The letter of credit was drawn to be carried abroad, and to be shown to any person or persons, who would advance funds thereon to the drawers, and it imported, that, if any persons, to whom it was shown, should advance the money, and take the bills on the faith thereof, the defendants would accept and pay the bills. Their letter of credit spoke this language to all the world, as expressively, as if they had stood by, and repeated it by their agent.

Take the case of a common letter of guaranty, where the guarantor says, in general terms, in a paper addressed to A. B., the party, for whose benefit it is given, "I hereby guaranty to any person advancing money, or selling goods, to A. B., not exceeding £100, the payment thereof, at the expiration of the credit, which shall be given therefor." Can there be a doubt, that any person, making the advances, or selling the goods, upon the faith of the letter, is entitled to treat the pa-

per as containing a direct and immediate promise to himself to guaranty the payment, notwithstanding it is addressed to A. B.? In the commercial world, as far as I know, no doubt has as yet ever been entertained on this subject; and yet, transactions of this sort are of every day's occurrence, especially where the person, by whom the advance is to be made, is uncertain or unknown. The case of Adams v. Jones, 12 Pet. [37 U. S.] 207, 213, is in point to show, that such a guaranty, in such general terms, will bind the guarantor in favor of any person, who shall trust the party upon the faith and credit of the guaranty. There is no pretence, in such a case, to say, that there is not a sufficient consideration for the promise or obligation; for the consideration need not be immediately for the benefit of the guarantor; but it will be sufficient, if there be a valuable consideration, moving from the guarantee at the request of the guarantor, in favor of a third person, for whom the benefit is designed. It is like the common case, where one man, for a valuable consideration of forbearance, or otherwise, undertakes to pay the debt of another. The question is not of gain to the promisor, but of loss, or detriment, or delay, on the part of the promisee. Lord Mansfield's reasoning, in Pillans v. Van Mierop, 3 Burrows, 1663, treats it as a clear case of a sufficient consideration; that it is a mercantile transaction; and that the very nature of it imports an undertaking by the promisor to the persons taking the bills, to honor them. Lord Mansfield went further in that case, and held, that the agreement to accept amounted to an actual acceptance in favor of the party, upon the ground, that he advanced the money, and drew the bill, upon the faith of the prior negotiations and promise. Mr. Justice Yates, in the same case, said, that "any damage to another, or suspension, or forbearance of a right, is a foundation for an undertaking, and will make it binding, although no actual benefit accrues to the party undertaking." He added: "Now, here, the promise and undertaking of the defendants did occasion a possibility of loss to the plaintiffs." In the case at bar a benefit did, in fact, accrue to Wiggin & Co.; for, in no other way, could they have received the interest and advances intended to be obtained by their grant of the letter of credit. In Pierson v. Dunlop, 2 Cowp. 571, 573, and in Mason v. Hunt, 1 Doug. 297, Lord Mansfield took notice of the true distinction between cases, where a promise enures solely between the parties, and where it enures in favor of a third person also. "It has been truly said, as a general rule, (was his language), that the mere answer of a merchant to the drawer of a bill, saying he will duly honor it, is no acceptance, unless accompanied with circumstances, which may induce a third person to take the bill by indorsement. But, if there were such circumstances, it may amount to an acceptance, although the answer be con-

tained in a letter to the drawer." The cases of Johnson v. Collings, 1 East, 98, and Clarke v. Cock, 4 East, 56, do not, in any manner, shake the propriety of this doctrine, as to its creating a privity of contract between the parties, whether it amounts to an acceptance, or not; and Mr. Justice Le Blanc, in both cases, expressly recognized Lord Mansfield's doctrine, as containing the true limitations and distinctions, which ought to govern in all cases of this sort. In the case of Johnson v. Collings, as well as in the case of Miln v. Prest, 4 Camp. 393, the promise to accept had not been shown to the party taking the bill, and, therefore, the bill was not taken on the faith thereof. Nor, indeed, had it been even authorized to be shown to the party; which constitutes the striking difference between such a promise and a letter of credit, the letter being, ex vi termini, designed to be shown, if necessary, to obtain the very credit or advances from a third person. Lord Mansfield, indeed, guarded himself on this very point, and said, not, that it always does create an acceptance, but that it may do so. Now, if it would, in any case, create an acceptance, a fortiori it would create a privity of contract, founded upon the promise to accept; for the latter must, in all cases, constitute the foundation of the former. In none of these cases was the point presented exactly under the view, in which it now comes before this court. In neither of them was there a letter of credit designed to circulate, and thus to preserve credit to the bills, which should be drawn. And not one word, in the reasoning of any of these cases, hints at any suggestion, that a letter of credit, in its commercial sense, would not create such a privity, if it was intended to be shown and used to induce any third person to advance money on the bills. If the question were entirely new, I confess that I should not entertain the least doubt, that, according to the known course of mercantile transactions upon letters of credit of this sort, the giver and the receiver intended them to be a circulating medium of credit for the receiver, and that the promise to accept should be an obligatory contract with any and every person who should advance money on the bills on the faith thereof. The language of Lord Mansfield, in Mason v. Hunt, 1 Doug. 297, 299, is exceedingly strong for this purpose: "There is no doubt (said he) that an agreement to accept may amount to an acceptance; and it may be couched in such words as to put a third person in a better condition than the drawer. If one man, to give credit to another, makes an absolute promise to accept his bill, the drawer, or any other person, may show such promise upon the exchange, to get credit, and a third person, who should advance his money upon it, would have nothing to do with the equitable circumstances, which might subsist between the drawer and the acceptor. But an agreement to accept is still but an agreement; and, if it is conditional,

and a third person takes the bill, knowing of the conditions annexed to the agreement, he takes it subject to such conditions." Now, it is impossible to read this language, and not to feel, that, if the case were one of a letter of credit, designed by the parties to be used upon the exchange, it would necessarily create a privity of contract between the party, advancing his money, and the drawee, binding upon the latter. In short, the contract would be a contract, not with the drawer alone, but with any party who should advance the money on the faith of the letter. I have seen no case in England, which shakes, much less which overturns, this doctrine. And, if there were, I should pause a great while, before I could bring my mind to desert the clear judgment of that great judge, Lord Mansfield, never excelled as a judge in the administration of commercial jurisprudence, upon a question of such plain equity and justice, in favor of any other and subsequent adjudication by other minds. I consider a letter of credit, drawn, like the present, for purposes of a general nature, to be equivalent in import and intention to the following language: "Take this letter of credit, show it to any person whatsoever, and I promise any person, who shall, on the faith thereof, advance you money on bills drawn within the scope thereof, that I will accept and pay those bills." I confess myself unable to perceive, upon any grounds of the common law, or of common sense and justice, why such a circulating promise should not be obligatory.

But, be the English doctrine as it may be, the present case must be governed, not by that law, but by the commercial law of America, where the contract was entered into. And it is perfectly clear, at least, in the jurisprudence, which is enforced in the supreme court of the United States, that a letter written within a reasonable time, either before or after the date of a bill of exchange, describing it in terms not to be mistaken, and promising to accept it, is, if shown to the person, who afterwards takes the bill on the credit of the letter, a virtual acceptance, binding upon the person, who makes the promise. This was expressly so held by the supreme court in Coolidge v. Payson, 2 Wheat. [15 U. S.] 66, 75, and has been fully recognised and established by that court in every subsequent case, which has arisen on the subject, and especially in Schimmelpennich v. Bayard, 1 Pet. [26 U. S.] 284, and Boyce v. Edwards, 4 Pet. [29 U. S.] 111. Now, it is plain, that, if such a promise becomes, as it were, a circulating promise to accept the bill, when drawn, in favor of, and to any party, who shall take the bill upon the faith of such promise, and operates as an acceptance of the bill, it must be, because the promise to accept, in such a case, is a promise by intendment of law made to the party, who takes the bill, and then, at his election, it may be treated as an acceptance; or as a

promise to accept. This, therefore, alone, would establish the point of a privity of contract between the party, giving the letter of credit, and the party, advancing the money, and taking the bill on the credit thereof; and it is manifestly founded on a sufficient consideration. Now, I know of no just or reasonable ground, upon which a distinction can be maintained between an implied acceptance, in favor of the person, who makes advances, and takes the bill under such circumstances, and a promise to accept the bill. In each case it enures as a direct contract with the party, founded upon the intent and the object of the letter of credit, or the written promise; and he has, and ought to have, his election, either to treat it as a positive acceptance, or as a promise to accept made directly to him, through the open letter of credit addressed to him, either specially or generally, for that purpose. Such is the doctrine, which, for many years, I have constantly supposed to be well established in the practice of the commercial world, and, therefore, never questioned in courts of justice; and, upon this very doctrine, my judgment proceeded in the recent case of Baring v. Lyman [Case No. 983]. It does not, however, rest upon my single opinion; but it has been fully recognized by the supreme court of the United States. In Townsley v. Sumrall, 2 Pet. [27 U. S.] 170, 181, the court said: "If a person undertake, in consideration, that another will purchase a bill already drawn, or to be thereafter drawn; and, as an inducement to the purchase, to accept it, and the bill is drawn and purchased upon the credit of such promise, for a sufficient consideration; such promise to accept is binding upon the party. It is an original promise to the purchaser, not merely a promise for the debt of another; and, having a sufficient consideration to support it, in reason and justice, as well as in law, it ought to bind him. It is of no consequence, that the direct consideration moves to a third person, as, in this case, to the drawer of the bill; for it moves from the purchaser, and is his inducement for taking the bill. He pays his money upon the faith of it, and is entitled to claim a fulfilment of it. It is not a case falling within the objects or the mischiefs of the statute of frauds. If A says to B, "Pay so much money to C, and I will repay it to you," it is an original, independent promise; and, if the money is paid upon the faith of it, it has been always deemed an obligatory contract, even though it be by parol; because there is an original consideration, moving between the immediate parties to the contract. Damage to the promisee, constitutes as good a consideration as benefit to the promisor. In cases, not absolutely closed by authority, this court has already expressed a strong inclination not to extend the operation of the statute of frauds, so as to embrace original and distinct promises, made by different persons at the same time, upon the

same general consideration. Then, again, as to the consideration, it can make no difference in law, whether the debt for which the bill is taken, is a pre-existing debt, or money then paid for the bill. In each case, there is a substantial credit given by the party to the drawer, upon the bill, and the party parts with his present rights at the instance of the promisee; whose promise is substantially a new and independent one, and not a mere guaranty of the existing promise of the drawer. Under such circumstances, there is no substantial distinction, whether the bill be then in existence, or be drawn afterwards. In each case the object of the promise is, to induce the party to take the bill upon the credit of the promise; and if he does so take it, it binds the promisor. The question, whether a parol promise to accept a non-existing bill, amounts to an acceptance of the bill, when drawn, is quite a different question, and does not arise in this case. If the promise to accept were binding, the plaintiff would be entitled to recover, although it should not be deemed a virtual acceptance." In Boyce v. Edwards, 4 Pet. [29 U. S.] 111, 121, 122, 123, the court held, that if, in the particular case, by reason of the bill to be drawn not being definitely described, in the manner limited by the case of Coolidge v. Payson, 2 Wheat. [15 U. S.] 75, the promise to accept would not operate as an acceptance of the bill in favor of the party receiving it, still, it would operate as a promise to him to accept the bill, when drawn, and thus be equally available for him. The language of the court, upon that occasion, was:—"The rule laid down in Coolidge v. Payson, requires the authority to be pointed to the specific bill or bills, to which it is intended to be applied, in order, that the party, who takes the bill upon the credit of such authority, may not be mistaken in its application." And again: "The distinction between an action on a bill, as an accepted bill, and one founded on a breach of promise to accept, seems not to have been adverted to. But the evidence necessary to support the one or the other, is materially different. To maintain the former, as has been already shown, the promise must be applied to the particular bill alleged in the declaration to have been accepted. In the latter, the evidence may be of a more general character, and the authority to draw may be collected from circumstances, and extended to all bills coming fairly within the scope of the promise. Courts have latterly leaned very much against extending the doctrine of implied acceptances, so as to sustain an action upon the bill. For all practical purposes, in commercial transactions in bills of exchange, such collateral acceptances are extremely inconvenient, and injurious to the credit of the bills; and this has led judges frequently to express their dissatisfaction, that the rule had been carried as far as it has; and their regret, that any other act, than a written ac-

ceptance on the bill, had ever been deemed an acceptance. As it respects the rights and the remedy of the immediate parties to the promise to accept, and all others, who may take bills upon the credit of such promise, they are equally secure, and equally attainable by an action for the breach of the promise to accept, as they could be by an action on the bill itself." The case of Adams v. Jones, 12 Pet. [37 U. S.] 207, 213, is equally explicit to show, that a written promise, made to one person, may enure as a promise in favor of another person, who gives credit on the footing of that promise, where the terms of the latter are such as prove, that it was intended to be shown, and to produce that very credit. The case of Carnegie v. Morrison, 2 Metc. [Mass.] 381, 395, 396, is also an authority to the same purpose; and, indeed, it runs on all fours with the present case.

It is unnecessary for me to add, that my own judgment is persuasively governed by these decisions, not merely as authorities, (although that would be a decisive ground), but upon principle, as tending to further and establish commercial confidence, and to give that sanctity, circulation, and faith, to letters of credit, which constitute the very foundations, upon which they were first built, and by which alone they can be sustained in the business of modern commerce. My judgment, therefore, is, that the plaintiff is entitled to recover the amount of the damages sustained by the refusal of the defendants to accept the bill in controversy.

What should those damages be? Should they cover all the money actually paid upon the protested bills by the plaintiffs, including re-exchange, together with interest; or should the re-exchange be excluded? It is clear, that the acceptor is not, ordinarily, bound to any holder to pay re-exchange, upon his refusal to pay the bill; but only to pay the principal and interest. But, here, the drawees (the defendants) have promised to accept and pay the bill upon a sufficient consideration; and I do not perceive any ground why the defendants should not be bound to indemnify the plaintiffs against all losses, including re-exchange, which have been the natural and necessary consequence of their refusal to perform their contract made with the plaintiffs. The defendants are not sued as acceptors; but as special contractors, who have broken their contract; by which breach the plaintiffs have been compelled to pay the very moneys, including re-exchange, which they now seek to recover back. It seems to me, that they are entitled to the full amount paid by them, and interest upon the same from the time when it was paid. That interest should be the interest of the place, where the money was payable by the plaintiffs, and, of course, where they were to be reimbursed. The case of Riggs v. Lindsay, 7 Cranch [11 U. S.] 500, seems to me a clear and satisfactory authority, that the plaintiffs are entitled to a full reimbursement of all the sums paid

by them, including re-exchange. This also appears to have been the opinion of Mr. Justice Bayley, in his work on Bills of Exchange. Bayley, Bills (5th London Ed. 1830) p. 353, c. 9; Id. (Am. Ed.) p. 380. It was also directly affirmed by Lord Camden, in Francis v. Rucker, Amb. 672. Pothier holds, that the acceptor is, in all cases, bound to pay the re-exchange to the holder, in the same manner, as the drawer would be, (Poth. De Change, note 117,) which is carrying the rule beyond what our law seems to justify. Napier v. Schneider, 12 East, 420; Woolsley v. Crawford, 2 Camp. 445. See, also, Story, Bills, §§ 459–463.

For these reasons I am of opinion, that the whole damages and costs, and expenses paid by the plaintiffs, including re-exchange, with interest, are to be included in the judgment for the plaintiffs.