PUTNAM NATIONAL BANK *vs.* WILLIAM M. SNOW & another.

Suffolk.    November 9, 1898. — March 2, 1899.

Present: FIELD, C. J., HOLMES, MORTON, & LATHROP, JJ.

*Bill of Exchange — Authority to draw — Discount on Faith of Assurance by Drawee — Promise to accept — Action.*

In an action by a bank upon an alleged promise to accept and pay drafts drawn by A. on the defendant and discounted by the plaintiff, two letters written by the defendant to A., which were shown by him to the plaintiff's cashier, and which conferred implied, if not express, authority upon A. to draw on the defendant for fruit which he was to ship to him, were put in evidence. There was also evidence tending to show that the defendant told the plaintiff's cashier that A. was to buy and ship fruit for his house, that he had authority to draw on the house, and that his drafts would be honored. The defendant testified that there was an agreement as to fruit from a certain grove that he would advance a sum named per box while A. should keep his account "margined up." One of the letters to A. also spoke of a draft at that rate per box. A. denied that anything was said to him about keeping his account "margined up," and testified that he drew many drafts on the defendant which were discounted by the plaintiff during certain months. *Held,* that there was evidence warranting a finding that A. had authority to draw the drafts in question, and that the plaintiff discounted them on the faith of assurances made to it by the defendant that drafts drawn by A. would be accepted and paid.

For the breach of an oral or written promise to accept a non-existing bill of exchange an action will lie by the holder of a bill drawn pursuant to such promise, and taken by him on the faith of it.

CONTRACT, in nine counts, against William M. Snow and Edward A. Snow, copartners as Snow and Company. The ninth count, which is the only one material to be stated, alleged that in 1894 the defendants entered into an agreement with Robert Long, by which he was to ship oranges from Florida to them in Boston, and in consideration therefor the defendants agreed with Long in writing that as shipments of oranges were made he might draw upon the defendants for an amount equal to $1.10 for each box of oranges so shipped, and that they would accept and pay such drafts, and the defendants also promised the plaintiff that they would accept and pay such drafts; and that on December 13 and 15, 1894, Long shipped a large number of boxes of oranges to the defendants, and made seven bills of ex-

change upon the defendants payable to the order of Long, for a sum amounting to $1.10 for each box of oranges so shipped, and Long indorsed the drafts to the plaintiff, which discounted the same, relying upon the written and verbal promise of the defendants to accept the same, and duly presented the same to the defendants for acceptance and payment, but the defendants refused to accept or to pay them.

Trial in the Superior Court, without a jury, before *Bond*, J., who allowed a bill of exceptions, in substance as follows.

Robert Long testified that he was an orange grower, and was acquainted with the defendants; that he received a letter dated October 8, 1894, signed " Snow & Co.," and also a letter dated November 30, 1894, signed " Snow & Co."; that his arrangements with the defendants were oral, except so far as appeared in the correspondence in evidence; that during October, November, and December, 1894, he made no drafts on the defendants; that he showed the letters of October 8 and November 30 to George L. Pace, cashier of the plaintiff bank, and Parker A. Smith, its vice president, soon after receiving them; that the instructions received from the defendant E. A. Snow orally, and the letters of October 8 and November 30, he communicated to the cashier; that he drew many drafts on the defendants without bills of lading attached, which were discounted with the plaintiff bank and paid by Snow and Company during the months of October, November, and December, 1894; that he drew all the drafts in suit, and had them discounted at the plaintiff bank; that he made shipments of oranges to the defendants on which he drew the drafts in suit; that up to December 15 he had made various shipments, some under his personal account and some under the accounts of various nonresident growers, represented by his name and different numbers, so that the various shipments and accounts could be distinguished; and that the defendants had never revoked his authority to draw upon them or to discount drafts so drawn.

On cross-examination, he testified that the original agreement did not impose upon him the necessity of attaching bills of lading, but that he did so in a great many cases; and that Snow and Company never said anything to him about margining up his various accounts.

Parker A. Smith testified that he was the vice president of the plaintiff bank at Palatka, Florida, which position he held during October, November, and December, 1894; that he was acquainted with the defendant E. A. Snow, and met him in November and December many times at the plaintiff bank when he called on business; that he had no conversation with him about Long's drafts, but was present during a conversation between Pace, the cashier, and Snow, in which Snow said that Long was under contract with his house to purchase and ship the fruit from several orange groves in and around Interlachen, Florida; that Long would draw on the house of Snow and Company at Boston against such shipments, and such drafts would be honored; that it was the understanding that bills of lading should be attached to the drafts, but that any drafts that Long would draw would be all right; that this conversation was on or about November 13, 1894; that Snow said on December 28 or 29, 1894, that the drafts in suit would be paid; that he did not understand why the drafts on the house had been refused, but he would wire the house and find out; that later he told Pace that some of the fruit shipped by Long was in bad order, and that the house proposed to hold Long for a portion of the loss; and that, upon being pressed to take up the drafts, Snow said, "You need not worry. The bank shall not lose a cent. Snow & Co. are good for the drafts. They will be paid."

On cross-examination, he testified that he did not become acquainted with Long until the winter of 1894–95, and considered him a responsible person; that he made no representations to the defendant as to whether he was responsible or not; that Long represented himself to be under contract with Snow and Company, with authority to draw on them; that the rate of $1.10 per box was not known to the witness; that the first lot of drafts was cashed upon receiving telegrams from Snow and Company to do it; that Long did not show his authority at first; that the bank did not rely at all on Long's statements; that the later drafts were paid by the bank after Snow had been at its office and instructed it to pay them; and that the bank relied entirely upon Snow and Company's telegrams, and Snow's statements made later in person to the bank.

The defendants offered in evidence their correspondence with

Long, referred to in his testimony, and the material parts of which were as follows.

The letter of October 8, 1894, contained the following: "As regards your oranges, we are willing to do whatever you desire us to do, and we will accept your draft for the amount named, but we think that all this could be arranged when we get there. But, in any event, if you feel like securing this lot, we would like to have you do so."

The letter of November 30, 1894, contained the following: "Your esteemed favor of the 27th is received, . . . and notice that you will draw $1.10 per box on these as per arrangement with our Mr. E. A. Snow. . . . As to B/L attached to drafts or sent direct to us, it makes no difference. The banks always like to have the B/Ls attached as a guaranty of good faith probably more than anything else; and very often B/Ls are written to the order of shipper and then attached to the draft, which holds the goods to the bank until the drafts are paid. In your case it makes no difference, however. You can send the B/Ls direct to us and it will be all right, and perhaps better, as we will no doubt receive a B/L direct from you earlier than it would come through the bank, and give us information that we would like."

E. A. Snow, one of the defendants, called as a witness, testified that he was a resident of Boston and a member of the firm of Snow and Company, which firm was in the fruit business, for the most part selling fruit at auction in large quantities; that he met Long in Florida in the winter of 1894–95; that he had had correspondence with him before he saw him in Florida; that he dictated the letter of October 8, 1894, before going to Florida; that one Francis had a lot of oranges to pick from a grove known as "Hard Bargain Grove"; that Snow and Company did not buy these oranges, but Long bought them, Snow and Company advancing $500 as a loan to Long to enable him to make the purchase; that there was an agreement as to the oranges from this grove, that Snow and Company would advance $1.10 per box, while Long should keep his account "margined up"; that there was no special agreement as to any other grove; that of the drafts in suit three were on account of the "Hard Bargain Grove," at the rate of $1.10 per box; that he had a conversation with

Pace, the cashier, at the plaintiff bank; that he thought Long was present; that he did not at the time know Parker A. Smith; that he told Pace that Long was shipping oranges, and was drawing $1.10 per box, and that his account would be all right so long as he kept his accounts "margined up"; that he did not state it as appears in Smith's testimony; that at the time these drafts came on and were refused, Long's account was overdrawn; that when the drafts were returned, Pace asked him why they had been refused; that he told him there was no trouble with Snow and Company, but that he presumed Long had overdrawn his account; that Pace did not then state in any form of words that he considered Snow and Company liable; that he never said to Pace in Smith's presence that Snow and Company were good for the drafts, and that they would be paid; that the term "margined up" meant keeping the account so that a man should not draw more than was his due; that they did not credit oranges to the shipper until they are sold; and that if shipments had been made sufficient in value to meet the amount due from the shipper, then the account was "margined up," but if the proceeds of the sales were less than the amount drawn, the account was not "margined up."

On cross-examination, he testified that there was no general arrangement except on "Hard Bargain Grove"; that the only drafts which he gave permission to draw at $1.10 were on that grove; that it made no particular difference to him whether the bills of lading were attached or not; that he never made the claim in January that the reason the drafts were not honored was because bills of lading were not attached; and that he did not remember telling the plaintiff's attorney that he had told Pace that the drafts would be all right without bills of lading attached.

Willis J. Freeman, called as a witness by the defendants, testified, in substance, that he remembered when the drafts in question were presented; that the shortage then on Long's account was between $2,000 and $2,500; that later some fruit came on and the shortage was reduced to about $437; that Long's account was not "margined up" when these drafts were presented, but it was short more than $2,200; and that all the goods had been disposed of at that time.

The defendants asked for the following rulings, among others:

"1. An oral promise to accept drafts not then in existence, and not exactly or substantially described or identified, is not an acceptance of drafts thereafter drawn, and gives the holder no right to recover upon drafts subsequently drawn and not accepted in the usual manner.

"2. There is no sufficient evidence in the case to entitle the plaintiff to recover upon its ninth count.

"3. An agreement between the defendants and Robert Long, whereby the defendants agreed with Long that Long might draw $1.10 per box, would not entitle the plaintiff to recover upon drafts drawn on the defendants by Long and not accepted by the defendants. Long is the only person, if any, who could sue for breach of such an agreement, and the evidence is that no such agreement was communicated to the plaintiff or relied upon by it.

"4. The only evidence for the plaintiff is that it did not rely upon Long's statements as to any contract with Snow and Company, and did ' rely entirely upon Snow's statements made later in person to the bank.' The plaintiff cannot, therefore, recover upon the allegations of its eighth or ninth counts, but must recover, if at all, upon its alleged conversation with E. A. Snow, as that conversation, in its aspect most favorable to the plaintiff, created no liability to the plaintiff upon drafts thereafter drawn by Long and discounted by the plaintiff.

"5. Upon all the evidence in the case upon the pleadings, there must be judgment for the defendants upon all the counts.

"6. The plaintiff makes no claim that it relied upon any contract or arrangement between the defendants and Long. It therefore cannot recover upon the eighth or ninth counts.

"7. An agreement to accept bills thereafter to be drawn, to be binding, must describe the bills in specific terms so as to identify them; a general authority to draw bills will not create a liability to third persons upon particular bills afterward drawn."

The judge declined to give the rulings requested; and the defendants excepted. The judge found for the plaintiff on the ninth count, assessing damages at $704.92, being the amount of the three drafts at $1.10 per box; and the defendants alleged exceptions.

*W. R. Sears,* for the defendants.

*F. H. Williams,* for the plaintiff.

MORTON, J.  The finding was for the plaintiff on the ninth count for the three drafts that were drawn for oranges from the "Hard Bargain Grove" at $1.10 per box, and the exception is to the refusal to give the rulings requested so far as they related to that count.  The other counts and the rulings relating to them are immaterial.

The ninth count was upon a promise to accept, and alleged in substance a promise in writing by the defendants to Long to accept and pay drafts drawn by him on them equal to $1.10 per box of oranges shipped, and also a verbal promise to the plaintiff to accept and pay such drafts, and that, relying on the written and verbal promises, the plaintiff discounted the drafts in suit for Long, and upon presentation the defendants refused to accept or pay them.

One question is whether there was any evidence to warrant the finding.  The letters of October 8 and November 30 from the defendants to Long, which were shown by him to the plaintiff's cashier, plainly imply authority on the part of Long, if they do not expressly confer it, to draw on the defendants for the fruit that he was to ship.  There was also evidence tending to show that one of the defendants told the plaintiff's cashier, in substance, that Long was to purchase and ship fruit for his house, that he had authority to draw on the house at Boston, and that his drafts would be honored; and later in the trial this defendant testified, amongst other things, "that there was an agreement, as to the oranges from this grove, that Snow and Company would advance $1.10 per box, while Long should keep his account ' margined up.' "  The letter of November 30 also spoke of a draft at the rate of $1.10 per box.  Long denied that anything was said to him about keeping his account margined up, and further testified " that he drew many drafts on the defendants, . . . which were discounted with the plaintiff bank and paid by Snow and Company during the months of October, November, and December, 1894."  We think that there was evidence warranting a finding that Long had authority to draw the drafts in question, and that the plaintiff discounted them on the faith of assurances made to it by the defendants that drafts drawn by Long would be accepted and paid.

It is clear that, in the absence of any statute to the contrary,

an oral acceptance of an existing bill of exchange is valid in this country, and that an indorsee of a bill so accepted may maintain an action on such acceptance against the acceptor. *Carnegie* v. *Morrison,* 2 Met. 381. *Exchange Bank* v. *Rice,* 98 Mass. 288. *Pierce* v. *Kittredge,* 115 Mass. 374. *Cook* v. *Baldwin,* 120 Mass. 317. *Coolidge* v. *Payson,* 2 Wheat. 66. *Townsley* v. *Sumrall,* 2 Pet. 170. *Russell* v. *Wiggin,* 2 Story, 213. *Spaulding* v. *Andrews,* 48 Penn. St. 411. *Bissell* v. *Lewis,* 4 Mich. 450. *Nelson* v. *First National Bank,* 48 Ill. 36. This was formerly the law in England, but it is now otherwise. It is clear also that for the breach of an oral or written promise to accept a non-existing bill an action will lie by the holder of a bill drawn pursuant to such promise and taken by him on the faith of it. *Boyce* v. *Edwards,* 4 Pet. 111, 122, 123. 1 Dan. Neg. Instr. § 559. 4 Am. & Eng. Encyc. of Law, (2d ed.) 238, 239. See cases *ubi supra.*

Whether an oral promise to accept a non-existing bill constitutes a virtual acceptance of it when drawn is a question on which the cases are not in entire accord, and which we have no occasion to consider here. See *Storer* v. *Logan,* 9 Mass. 55, 58. The ninth count, as has been observed already, is a count upon a promise to accept, and not upon an acceptance. We discover no error in the refusals to rule as requested.

*Exceptions overruled.*