# CASES

IN THE

# SUPREME COURT OF ALABAMA.

## DECEMBER TERM, 1879.

# Whilden & Sons *v.* Merchants' and Planters' National Bank.

*Action on Common Counts, and Special Count on Breach of Promise to Pay Bill of Exchange.*

1. *Joinder of counts; when allowed.*—By statutory provision (Code, § 2986), all actions on contracts, express or implied, for the payment of money, whether under seal or not, may be joined; but the joinder of counts *ex contractu* with counts *ex delicto* is unaffected by statutory provisions, and is good ground of demurrer to the entire complaint.

2. *Form of count; how determined.*—When a party may, at his election, on the same state of facts, sue either in tort or on contract, although it may be difficult to determine the form of action to which the count belongs, its character must be determined by the facts stated in the body, and the form of action must be intended to be that which is alone adapted to the measure of recovery for which the plaintiff proceeds.

3. *Same; difference between tort and contract.*—When a count states facts which show a right of action in trover for the conversion of plaintiff's goods by defendant, or, at his election, waiving the tort, in assumpsit for the proceeds of sale; if it proceeds for the value of the goods, irrespective of the price received for them by the defendant, it is in tort; but, if it claims the proceeds of sale received, instead of the value of the goods, and deduces the defendant's liability from his failure and refusal to pay them to the plaintiff on demand, it is *ex contractu.*

4. *Acceptance of bill, or promise to accept; how declared on* —In declaring against a party as the acceptor of a bill of exchange, it is not necessary to aver that the acceptance was in writing; and in declaring on a promise to accept, made before the bill was drawn, it is not necessary to aver that it was in writing and unconditional; though the proof of these facts on the trial may be necessary to entitle the plaintiff to recover.

5. *Proof of telegram.*—The general rule which requires the production of the best evidence, and excludes secondary evidence of a writing which can be produced, is applicable to messages sent by telegraph; but, whether the message given to the telegraph office to be sent, or that delivered at the place of destination to the party to whom it is sent, be regarded as the original, the latter may be received in evidence, when it is shown that the custodian of the other, and the office to which it was delivered to be sent, are beyond the jurisdiction of the court; and an admission by the party against whom it is offered, that the message received is correct, renders it admissible evidence.

[Whilden & Sons v. Merchants' and Planters' National Bank.]

6. *Redundant evidence.* —The admission of evidence which, though illegal, is simply redundant, or superfluous, is, at most, error without injury.

7. *Former transactions between parties; relevancy of evidence as to.* —The course of dealing or business between parties, in former similar transactions, is generally admissible evidence, as furnishing the basis of a presumption that, except so far as changed by agreement, it was intended to be observed in the particular transaction in controversy.

8. *Acquiescence and waiver by principal.* —When a broker buys cotton for his principal on an order, and the principal receives it without objection as to the time within which the order was filled, he thereby acquiesces in and ratifies the purchase, so far as time was a material element, and can not afterwards raise any objection to the time within which it was made.

9. *Objection to evidence; when and how made.* —A motion to suppress the answer to an interrogatory, on the ground that it is not responsive, must be made before the trial is begun ; but, if the evidence is irrelevant, it may be assailed by a general objection, and be excluded at any stage of the trial ; and if an answer is objected to, on the ground that it is not responsive to the interrogatory, and because it is "otherwise illegal," the objection is sufficient to exclude irrelevant evidence.

10. *Charges confusing or misleading jury; explanatory charges.* —Giving a charge which, though tending to confuse and mislead the jury, does not assert an incorrect legal proposition, rests largely in the discretion of the primary court, and is not an available error: the party apprehending injury from it, may protect himself by asking explanatory charges.

11. *Liability of principal, for act of agent.* —When a broker is authorized by his non-resident principal to buy cotton of a particular quality, and at a specified price, and to draw on his principal for the purchase-money, the bank to which he applies, and which advances to him in good faith the money to pay for the cotton, taking his draft on his principal, is not bound to inquire whether the price and the quality of the cotton conform to the terms of the order. These matters were submitted to the discretion of the broker, and persons dealing in good faith with him had a right to rely on his representations in reference to them.

12. *Acceptance of bill, and promise to accept; requisites of.* —Acceptances of bills of exchange, and promises to accept bills before they are drawn, are required to be in writing (Code, §§ 2101–02); but the statute changes only the mode of proof, and not the words or expressions necessary or sufficient to constitute an acceptance or promise to accept.

13. *Same* —A letter, addressed to a cotton-broker by non-resident dealers, inquiring the price of cotton, and adding, "If we see a margin, will authorize you to draw for the cost ;" and a subsequent message by telegraph, on being informed of the price, "Will advance cost, if you buy strict good ordinary at sixteen,"—together constitute an unconditional promise to accept the broker's draft for the price of the cotton, and, under the statute, amount to an actual acceptance.

14. *Presentment; when not necessary.* —To charge a party as acceptor, on an unconditional promise in writing to accept a bill before it is drawn, presentment for acceptance or payment is not necessary.


APPEAL from the City Court of Montgomery.

Tried before the Hon. JOHN A. MINNIS.

This action was brought by the Merchants' & Planters' National Bank of Montgomery, Alabama, a corporation chartered under the acts of Congress, against A. Whilden & Sons, a mercantile partnership doing business in Philadelphia; and was commenced by attachment, sued out on the 29th May, 1873, on the ground of the defendants' non-residence. The original complaint contained four counts, and five other counts were added by amendment. As a demur-

rer was sustained to the second count, it is not necessary to notice it. The third and fourth counts were the common counts for money had and received, and money paid, laid out, and expended; and the others were, in substance, as follows:

1. Plaintiff claims of defendants $10,000, "due by them to said plaintiff, on account of a breach of promise on the part of said defendants to pay a certain bill of exchange, dated the 1st April, 1873, at Montgomery, Alabama, for the sum of $4,313.59, drawn by one John H. Clisby, for said defendants, and payable at sight to the order of said plaintiff, by the name of '*A. B. Peck, cashier*'; which said bill of exchange was, on the day and year aforesaid, delivered to said plaintiff, for value then and there paid, at the request, and for the benefit of said defendants, and was afterwards, to-wit, on the 22d April, 1873, presented to said drawees for payment, and due payment thereof demanded, according to the tenor and effect of the said bill; but the said defendants then and there refused to pay said bill, or any part thereof; and said bill was, on the day and year last aforesaid," duly protested for non-payment, in Philadelphia, where defendants then resided, and were carrying on business. "And plaintiff avers, that said defendants were bound to pay said bill; for that the said defendants, on the 18th day of April, 1873, authorized and empowered the said John H. Clisby to purchase cotton, of the quality of 'good ordinary,' at sixteen cents per pound, and 'low middlings,' at sixteen and one-half cents per pound, and agreed and promised that they would advance the money to pay the cost of said cotton; which said cotton was to be shipped to said defendants, and was to be sold by them for a certain commission; and plaintiff avers that said Clisby, in accordance with said authority, did purchase fifty-four bales of cotton, of the description, and for the prices stated in said authority, and, for the purpose of paying the cost of said cotton, drew his bill on said defendants as above set forth, for the sum aforesaid, and that said sum was advanced by said plaintiff, to pay the cost of said cotton, on the faith of the authority given to said Clisby by said defendants as aforesaid; and that the sum so advanced was the cost of said cotton, and was by said Clisby appropriated to the payment thereof. And plaintiff further avers, that the cotton so purchased was shipped to said defendants, and was received and sold by them; whereby they became and are liable to pay plaintiff the amount aforesaid, with interest thereon."

5. Plaintiff claims of defendants the further sum of $4,313.59, due from them to plaintiff, with interest thereon from the 22d April, 1873, " on account of a breach of promise

on the part of said defendants to pay a certain bill of exchange," describing the bill as before; "which said bill was, on said 16th day of April, 1873, delivered by said Clisby to plaintiff, for consideration of the said sum of $4,313.59, then and there paid and advanced to said Clisby, and was afterwards, on the 22d day of April, 1873, exhibited to said defendants for payment, but said defendants then and there refused to pay the same," and it was thereupon duly protested for non-payment. "And plaintiff avers, that said defendants were bound to pay said bill, because said defendants, prior to the 16th day of April, 1873, authorized and empowered the said Clisby to draw on them to pay the cost of cotton to be purchased by him, to be shipped to said defendants on his account, and promised, in consideration of the commission to be derived from the sale of said cotton, to pay all drafts drawn by him for the costs of all cotton purchased by him, of the quality of 'strict good ordinary' at sixteen cents, and 'low middlings' at sixteen and one-half cents per pound. And plaintiff avers, that said authority was of full force and effect, and binding on said defendants, when said bill of exchange was drawn by said Clisby, and bought by plaintiff of said Clisby. And plaintiff further avers, that said bill above described was drawn for the payment of the cost of fifty-four bales of cotton, of the description and for the price stated in said authority, bought by said Clisby on his own account, to be shipped to said defendants, in pursuance of the authority before that time given by them to said Clisby, and then in full force and binding on said defendants; and on the faith of said power and authority, then in full force and binding on said defendants, plaintiff purchased said bill of exchange of said Clisby, and on the faith of said authority to draw on said defendants for the cost of said cotton, and relying on said authority as of full force and binding on said defendants, and on the representations of said Clisby to that effect, plaintiff advanced to him the said sum of $4,313.59, the sum specified in said bill of exchange, and the amount of the cost of the cotton so purchased by said Clisby; which said sum of money was appropriated by said Clisby to the payment of the costs of said fifty-four bales of cotton, so bought and shipped by him as aforesaid. And plaintiff further avers, that said fifty-four bales of cotton were shipped by said Clisby to said defendants, and were received by them; but still they refuse to pay said bill, and sold said cotton, and appropriated the proceeds to their own use, and said bill remains still unpaid. And plaintiff avers, that by reason of the premises the defendants are liable to pay the amount of money in said

bill of exchange specified, together with the interest thereon."

6. Plaintiff claims of defendants the further sum of $4,313.59, with interest from the 22d April, 1873, "being the purchase-money of fifty-four bales of cotton bought by J. H. Clisby, in Montgomery, Alabama, and shipped by him to said defendants at Philadelphia, on his account, and paid for by said plaintiff, at the special instance and request of the said Clisby, by money advanced to him for the purpose of making payment of the purchase-money of said cotton. And plaintiff avers, that said cotton was bought by said Clisby, to be shipped to said defendants, on his own account, on the faith and credit of a certain authority given by said defendants before the 16th day of April, 1873, when the said money was so advanced by said plaintiff to said Clisby; which said authority was then in full force and effect, and authorized the said Clisby to buy cotton of the grade of 'strict good ordinary' at sixteen cents, and 'low middlings' at sixteen and a half cents, on his own account, to be shipped to said defendants; and promised to pay any such bills or drafts, drawn by said Clisby on said defendants, in payment of the cost of any cotton so purchased, to be shipped to said defendants. And plaintiff avers, that said cotten was of the quality of 'strict good ordinary,' or over, and the cost thereof was not more than the prices fixed by said authority; and that said Clisby, in pursuance of the said authority, bought the fifty-four bales of cotton as aforesaid, and, on the 16th day of April, 1873, drew his draft or bill on said defendants, payable," &c., describing the bill, "and delivered the same to plaintiff, on the day and year aforesaid, in order to raise money thereon to pay for said bales of cotton; and plaintiff, relying upon the said authority to said Clisby from the said defendants, advanced to the said Clisby the said sum of $4,313.59, and thereby enabled the said Clisby to pay the cost of said cotton, which he did with the said money. And plaintiff avers, that said bill was duly presented to said defendants, in said city of Philadelphia, for payment, on the 22d April, 1873, and they refused to pay the same ; whereupon said bill was duly protested fer non-payment. Wherefore, said defendants are liable to said plaintiff said sum of $4,313.59, and interest thereon."

7. Plaintiff claims the further sum of $4,313.59, due from defendants, with interest from 22d April, 1873, "on account of a breach of promise on the part of said defendants to pay a certain bill of exchange," describing it as above, "which was, on the 16th April, 1873, delivered to plaintiff by said Clisby, in consideration of said sum of $4,313.59, then and

there advanced and paid to said Clisby, and was afterwards, on the 22d April, 1873, exhibited to said defendants for payment, and payment thereof demanded; but said defendants then and there refused to pay the same, and said bill was thereupon duly protested for non-payment," &c. "And plaintiff avers, that said defendants were bound to pay said bill, because said defendants, prior to the 16th April, 1873," authorized Clisby to purchase cotton as above stated, and to draw on them for the cost of the cotton, and promised to pay his drafts; which authority was in full force, and binding on defendants, when said bill of exchange was drawn by Clisby, and bought from him by plaintiff. And plaintiff avers, that said bill of exchange was drawn by Clisby to pay the cost of fifty-four bales of cotton, of the specified quality, which he had bought at the specified price, to be shipped to said defendants, in pursuance of the authority which they had thus given him; and that plaintiff bought said bill from Clisby on the faith of said authority, and relying on the said promise of defendants, and advanced to him the sum of money specified in the bill, which was by him appropriated to the payment of the cost of said cotton; and that said cotton was shipped to said defendants, and was received and sold by them. "And plaintiff further avers, that on the 16th day of April, 1873, said Clisby transferred, to-wit, fifty-four bales of cotton to plaintiff, bought as aforesaid by him and paid for by plaintiff as aforesaid, and shipped as aforesaid to said defendants; of all which said defendants were duly notified, [and] required to hold said cotton; but said defendants refused to regard said transfer, or said notice, and, in utter disregard of plaintiff's rights, refused to pay said sum of $4,313.59, and sold said cotton, and appropriated the proceeds thereof to their own use, and refused to account for the same, although often requested so to do; whereupon, plaintiff is entitled to recover from said defendants the said sum of $4,313.59, with interest thereon."

8. Plaintiff claims of defendants the further sum of $4,313.59, with interest from the 22d April, 1873, "being the purchase-money of fifty-four bales of cotton, bought by J. H. Clisby, in Montgomery, Alabama, and shipped by him to said defendants, in Philadelphia, on his own account, and paid for by plaintiff at the special instance and request of said Clisby, by money advanced to him for the purpose of making payment of the purchase-money of said cotton, the amount aforesaid being the purchase-money of said cotton. And plaintiff avers, that said cotton was bought by said Clisby, to be shipped to said defendants, on his own account, on the faith and credit of a certain authority, given by said defendants

before the 16th April, 1873, which authorized Clisby to buy cotton of the quality specified, at the price specified, to be shipped on his own account to said defendants, and promised that defendants would pay any drafts drawn by Clisby to pay for said cotton. And plaintiff avers, that the cotton so purchased by Clisby was of the specified quality, and the cost was not greater than the price specified; that on the 16th April, 1873, having bought said fifty-four bales of cotton, Clisby drew said draft, or bill of exchange, and delivered it to plaintiff, in order to raise money to pay for said cotton; and that plaintiff, relying on said authority given to him by defendants, advanced to Clisby the sum of money specified in said draft, and thereby enabled him to pay for the cotton, as he did with the money so advanced to him; that the bill was duly presented to the defendants, for payment, on the 22d April, 1873, and they refused to pay it, whereupon it was duly protested. "And plaintiff avers, that after the refusal of said defendants to pay said bill, and after the protest thereof as aforesaid, to-wit, on the 27th April, 1873, [said Clisby] transferred and assigned to plaintiff said fifty-four bales of cotton, so purchased by said Clisby as aforesaid, and paid for by plaintiff as aforesaid, and shipped to said defendants as aforesaid; of all which said defendants were duly notified, and required to hold said cotton for the account of plaintiff; but said defendants refused to pay said draft, or to regard said transfer so made as aforesaid, and refused to hold said cotton for the account of plaintiff, and, in disregard of said plaintiff's rights in the premises, sold said cotton on their own account, and applied the proceeds thereof to their own use, and refused, and still refuse to account to plaintiff for said proceeds, although often requested to to do. Wherefore, said defendants are liable to plaintiff, for said sum of $4,313.59, with the interest thereon, as above demanded."

9. "Plaintiff claims of defendants $10,000, due on a bill of exchange, which was drawn by John H. Clisby, on, and accepted by the defendants, dated April 16, 1873, and payable at sight, for the sum of $4,313.59, to the order of plaintiff, by the name of 'A. B. Peck, cashier;' which said bill, with interest thereon, is still unpaid."

The defendants demurred to the entire complaint, on the ground that there was a misjoinder of counts—"because counts in case are joined therein with counts in assumpsit, and because counts in trover and in assumpsit are joined;" and also to each count separately. The grounds of demurrer to the first count were—1st, because it is partly in assumpsit, and partly in case; 2d, because it seeks to charge the de-

fendants as the acceptors of the said bill of exchange, and does not aver that there was an acceptance in writing by them, nor that there was an unconditional promise in writing by them to accept said bill before it was drawn; 3d, because it seeks to charge the defendants on a promise to pay said bill of exchange, without stating when and to whom such promise was made, and on what consideration it was based; 4th, because it shows a right of action, if any at all, only in favor of Clisby; 5th, because it seeks to charge the defendants on a promise to pay the bill of exchange, but sets out no promise to plaintiff to pay it, and states no facts on which a binding promise to pay it to plaintiff could be implied; 6th, because said count, as an action of assumpsit, does not show a promise to plaintiff, and is defective, as a count in case, in not averring an intent to deceive and defraud plaintiff; 7th, because it shows no privity of contract between plaintiff and defendants.

To the fifth count, the grounds of demurrer were—1st, because it is for a breach of a promise to pay a bill of exchange, which is not averred to have been made or signed by the defendants, nor accepted by them in writing, nor by any unconditional promise in writing to accept the bill before it was drawn; 2d, because it does not show to whom the promise to pay the bill was made, nor the consideration thereof; 3d, because it does not show that any promise to pay the bill was made to plaintiff, or that any valid promise to accept it was made to any other person or persons and legally assigned to plaintiff; 4th, because the alleged promise to pay the bill was a promise to pay the debt of another, and it is not shown that it was in writing, or expressed the consideration thereof, and was signed by the defendants, or by their agent lawfully authorized in writing; 5th, because it shows no privity between plaintiff and defendants, and only shows a right of action in Clisby, if any at all.

To the sixth count, it was assigned as ground of demurrer, that said count shows no liability on the defendants as acceptors of the bill of exchange, and does not show that the authority and promise, alleged to have been made and given to Clisby, was in writing, expressing the consideration, and was signed by the defendants, or by their agent lawfully authorized in writing; nor does it show any consideration for said authority and promise, nor any right in plaintiff to maintain an action thereon, though it was a good and valid agreement with Clisby.

To the seventh count, it was assigned as ground of demurrer, that it was partly in tort, and partly in assumpsit; and to the part which was in assumpsit, it was also assigned—

1st, that it does not aver that the bill of exchange was made or signed by the defendants, or accepted by them or their agent, and does not show an unconditional promise in writing to accept before the bill was drawn; 2d, that it does not show to whom the promise to pay the bill was made, nor the consideration of such promise; 3d, that it does not show that the promise to pay the bill was made to plaintiff, or that any binding promise to accept said bill was made to any other person, and legally assigned to plaintiff; 4th, that the alleged promise to pay said bill is shown to be a promise to pay the debt of another, and it is not shown that it was in writing, and expressed the consideration thereof, and was signed by the defendants, or by their agent lawfully authorized in writing; 5th, that it shows no privity between plaintiff and defendants, and only shows a right of action in Clisby, if any at all; 6th, that it does not state the value of the cotton alleged to have been converted; 7th, that it does not aver that the transfer of the cotton was made, and notice thereof given to the defendants, before said cotton was received by them; 8th, that no demand for the cotton is averred or shown; and, 9th, because there is no averment that the proceeds of the cotton were converted by the defendants. The same grounds of demurrer, in substance, were specifically assigned to the eighth count. It was also assigned as ground of demurrer to each of the special counts—1st, that neither of them averred that the bill of exchange was ever presented or shown to the defendants on any day prior to that on which payment was demanded; and, 2d, that the action should have been for the non-acceptance of the bill. All the demurrers being overruled, except as to the second count, the defendants then pleaded "the general issue; on which plea issued was joined, with leave to give in evidence any matter that would be available if specially pleaded."

On the trial, as the bill of exceptions shows, the plaintiff proved the material facts averred in the complaint, substantially as alleged, by the testimony of J. H. Clisby, a cotton-broker in the city of Montgomery, through whom the business connected with the cotton and the bill of exchange was transacted. The principal facts, stated in brief, were these: On the 28th March, 1873, Clisby received a letter from the defendants at Philadelphia, inquiring at what price he could purchase cotton, and stating that, if they could "see a margin," they would authorize him to draw on them for the cost; and having replied to that letter, he received from them a telegram, dated April 8th, stating that they would "advance the cost," if he bought cotton of a particular quality, at a specified price. Clisby accordingly bought fifty-four bales

of cotton, which he testified were of the quality specified in the telegram, and drew a bill of exchange for the cost, corresponding with the bill described in the complaint; and the money on this bill was advanced to him by the plaintiff, to whom he showed the defendants' letter and telegram, as his authority to draw the bill.  This money was used by Clisby in paying for the cotton, which he shipped to the defendants; and the defendants received and sold the cotton, but refused to accept or pay the bill, and applied the proceeds of sale of the cotton to the payment of an alleged balance due to them by Clisby on former transactions.

The defendants' telegram, which, as received by Clisby, and produced on the trial, was "written on one of the blanks of the Western Union Telegraph Company," dated Philadelphia, April 8th, 1873, and received at Montgomery on the same day, at 7:05 p. m., was in these words: "Will advance cost, if buy strict good ordinary at sixteen, and low middling at sixteen half."  The letter of the 28th March, 1873, was in these words: "Your favor of 2d inst. received.  We write you to know at what you could lay down here st. g. ord and above, even running lots.  Such are scarce, and could be sold at quotations.  If we can see a margin, will authorize you to draw cost.  We must say, however, your classifications heretofore have not been sustained by the cottons sent, by full one to one and a half grades; and the sales we made for you, of all grades below st. g. ord., could not be repeated to-day, or at any time since we sold.  Low cottons are not saleable at all," &c.  The rulings of the court during the trial, to which exceptions were reserved by the defendants, are stated at great length in the bill of exceptions, but can not well be abbreviated.

"The plaintiff introduced J. H. Clisby as a witness, who was a cotton-buyer in the city of Montgomery, and testified that he had been engaged in that business a number of years, and was well acquainted with the different grades and qualities of cotton, and had large experience in sampling and classing cotton; that in March, 1873, he received a letter from defendants," being the letter above copied, which he produced, and which was offered in evidence by the plaintiff; "and that he telegraphed to defendants, some time after the receipt of said letter, giving the price of cotton.  To this statement defendants objected, because the original telegram, in the handwriting of defendants, was not produced, or accounted for; but the court overruled the objection, and allowed said statement of the witness to go to the jury; to which ruling the defendants excepted.  Witness was then showed a paper," the telegram above copied, "and stated

that said paper was delivered to him by the agent (or messenger) of the Western Union Telegraph Company, at Montgomery, on the morning of the 9th April, 1873, that said paper was not in the handwriting of the defendants, from whom he had received many letters, and was not in the same handwriting as the letters he had received from them. It was proved, also, that said telegram was regularly received at the telegraph office in Montgomery, and was in the handwriting of the telegraph agent at Montgomery, and was dated at Philadelphia. Plaintiff then offered said paper in evidence, and defendants objected to its admission. Plaintiff thereupon introduced A. B. Peck as a witness," who was the plaintiff's cashier, "and who testified that, in May, 1873, he was in Philadelphia, where defendants resided and did business, and called on them, and showed them said paper, and that they then admitted to him that they sent the telegram of which said paper is a copy. Plaintiff then again offered said paper in evidence;" and the court admitted it, against the objection of the defendants, and they duly excepted.

"Clisby then stated, that he showed said paper to plaintiff, and told plaintiff of said letter of the 28th March, and, on the 14th day of April, he bought and shipped fifty-four bales of cotton, some of which was 'good ordinary,' and some 'low middling,' at sixteen and one-quarter cents per pound, and shipped them to defendants at Philadelphia, to be sold by them on his account; that he did not himself sample the cotton, and the only knowledge he had of its quality was by samples brought to him by a young man whom he employed to sample cotton. Defendants then moved the court to exclude from the jury all that the witness had said in relation to the grade or quality of the cotton; but, plaintiff's counsel stating that they expected to connect the samples with the bales of cotton, the court declined to exclude the evidence at that time, but ruled that it would be excluded unless the plaintiff offered further evidence connecting the samples with the cotton; to which action of the court the defendants excepted. Said witness stated, also, that when he purchased said cotton, he drew his check on plaintiff for the price, and when he shipped said cotton he took a bill of lading therefor," which was produced and identified, and which was admitted in evidence by the court, against the objection of the defendants; and to this ruling, also, they duly reserved an exception. "The witness further stated that, on the 16th day of April, 1873, he went to plaintiff's bank, and delivered to them the said bill of lading, and executed and delivered to them his bill of exchange," as described in the complaint; which bill, with the protest thereof, was produced and offered in

[Whilden & Sons v. Merchants' and Planters' National Bank.]

evidence by the plaintiff, and was admitted by the court, against the objection and exception of the defendants.

"Said witness then stated, that it was the custom in Montgomery, Alabama, among cotton-buyers doing their business with banks, to make an arrangement with the bank to procure from it the money to purchase cotton, and to settle for the same by giving a bill of exchange, and attaching to it a bill of lading for the cotton so purchased. To this statement of the witness, as to said custom, the defendants objected;" and they reserved an exception to the overruling of their objection. "Plaintiff then asked said witness, whether he had made previous transactions, of a similar character with this, with defendants, through plaintiff's bank;" "to which the witness answered, that he had several other previous transactions of a similar character with defendants, through plaintiff's bank—that the usual course of business between them was this: witness would telegraph to defendants, informing them of the state of the market, and asking permission to draw on them for the price of cotton to be bought by him on his own account and shipped to them; and if defendants thought there was any profit in cotton at that price, they authorized him to draw on them for the price; that he had done this character of business with defendants for several years, and as late as the fall of 1872, and that they had always, before this time, paid the bills so drawn by him." The defendants objected to this question, and also to the answer; and they reserved exceptions to the overruling of their objections.

"Witness was then shown certain letters, purporting to have been written by the defendants, dated respectively the 21st, 22d, 27th, and 30th April, 1873; which letters, he said, were in the handwriting of the defendants, and were taken by him from the post-office at Montgomery." These letters all relate to the shipment of fifty-four bales of cotton above mentioned. The first acknowledges the receipt of the invoice for the cotton, and of Clisby's letter informing them of the draft for the price, but not specifying the price; adding, "If cost, we will pay it, with the fear that it will not cover the draft; so we hope you have left the margin we always want," &c. The next incloses account of sales, and their account against Clisby (and also against Duncan & Clisby, a partnership of which he was a member), showing a balance of about $7,000 against him on account of former transactions; and adding, "When we wrote you on yesterday, we had no idea the debt was so great, though we knew the business had been disastrous. * * * In this view of the situation, not having the fifty-four bales, when we can judge

value, neither samples of them, we have concluded not to accept the draft drawn against the fifty-four bales, fearing its payment would only increase your indebtedness, as has been all our experience in the past." The third letter speaks of the offers they have had for the cotton, complains of the quality and price, and expresses the hope that Clisby "will arrange to let this lot go towards" his past indebtedness; and the last, dated April 30, is in these words: "Your telegram replied to, saying we would not pay $4,000. We are not willing that your indebtedness to us should remain so large. You admit you have no way of paying except out of future profits, which may never be made; and so we propose to apply your late invoice to your credit with us. We have had several telegraphs from A. B. Peck, cashier, to which we have not replied. The shipment being from you to us, we leave you to arrange with him any matters between you. We are disposed to be liberal; and if the bank, or any friend, will pay 50 per cent. on the dollar of your debt to us, we will give a release in full," &c. The plaintiff offered each of these letters in evidence, and the court admitted them, against the objections of the defendants; to which several rulings they duly reserved exceptions.

"Said witness then further testified, that after receiving the defendants' said letter of the 22d April, above mentioned, he went to the bank, and by parol transferred to plaintiff the said cotton, and wrote and delivered to the said telegraph company at Montgomery a telegram directing defendants to hold said cotton for account of plaintiff. Said witness also stated, on cross-examination, that, at the time he made this transaction, he was indebted to the defendants on general account current, but did not believe that, on a fair statement of their accounts, he would owe them more than one thousand dollars; that at the time he received said telegram he could not buy cotton, of the grades mentioned, at the prices stated in the telegram, said grades being above those prices from one-half to five-eights of a cent, but the market declined until the 14th day of April, when he was able to buy the cotton as above stated; and the witness stated, also, that defendants were to receive commissions for selling said cotton.

"Plaintiff then introduced one Saville as a witness, who was and had been the manager of the office of the Western Union Telegraph Company at Montgomery, from January, 1873; and said witness produced, at the request of plaintiff, two papers (telegraphic messages), which he said he had taken from the files of said office at Montgomery." (One of these telegrams was from Clisby to the defendants, dated April

28th, 1873, and in these words : " Have you received cotton ? Hold for account of A. B. Peck, cashier. Reply immediately." The other was from said Peck, cashier, to defendants, dated April 27th, and in these words : " Hold fifty-four bales cotton shipped by Clisby for our account. Answer immediately.") " He was then asked, by plaintiff, if these messages had been sent; and answered, that he did not know, of his own knowledge, that they had been sent—that he did not himself send them ; that it was the practice in the office for each telegraph operator, when he sent a dispatch, to place on it certain peculiar marks, showing by what operator it was sent, and the fact that it had been sent; that he saw these marks on each of these papers, and, from these marks, believed that they had been sent. Defendants objected to the admission of each of these papers separately, at the time they were each offered," and reserved exceptions to the overruling of their objections.

"Plaintiff then introduced A. B. Peck as a witness, who testified, that he was the cashier of plaintiff's bank, and had been since 1872; that Clisby showed him the said telegram of 8th April, and made an arrangement with him, as plaintiff's agent, to buy cotton according to the terms of said telegram, and check on plaintiff for the cost of said cotton, and pay plaintiff by a check on defendants ; that Clisby did check on said bank for the cost of fifty-four bales of cotton, and plaintiff paid his check, and, on the 16th April, he drew and delivered to plaintiff his bill of exchange on defendants, in favor of witness as cashier, for the amount of the cost of said cotton, with exchange between Montgomery and Philadelphia added, to pay for the cost of said cotton so advanced by plaintiff; that plaintiff advanced said money on the faith of said telegram of April 8th, and on the faith of said letter of defendants of March 28th, of which Clisby had told him ; that plaintiff took said bill of exchange from Clisby, with bill of lading attached, and sent it to Philadelphia, where it was presented to defendants for payment, but was not paid, and was thereupon protested for non-payment; that witness then went to Philadelphia, in May, 1873, and called on defendants, and demanded payment on the part of plaintiff ; that defendants told him they would not pay, because Clisby was indebted to them, and they had sold the cotton, and credited the proceeds to Clisby's account; and they further stated, that the cotton shipped by Clisby was not of the quality specified in their said telegram, and showed witness the original samples of the cotton, which samples had been sent to them by Clisby, and also the re-drawn samples taken from the cotton after it reached Philadelphia; that what

their broker said was the re-drawn samples, was, in the opinion of witness, superior to the original samples ; that he (witness) was well acquainted with the various grades and qualities of cotton, and had considerable experience in sampling and classifying cotton ; that, on his expressing his opinion that the re-drawn samples were superior to the original samples sent by Clisby, defendants insisted that there was a mistake in the package of samples, and that he should wait until they sent and procured further samples of the cotton, but witness declined to do so.   Witness stated, also, that he had exhibited to defendants the said letters and telegram given in evidence, and they acknowledged their genuineness.

"Plaintiff then introduced M. M. Copeland as a witness, who testified, that he was a cotton-buyer, of many years experience, and had been engaged in that business, in the city of Montgomery, for fifteen or twenty years ; that it was the custom, among cotton-buyers in said city, to consider an order to buy cotton at a particular price as binding until it was revoked in terms.   To this statement defendants objected, and moved the court to exclude it from the jury ; and they excepted to the overruling of their objection, and to the admission of said evidence.   The plaintiffs here rested ; and the defendants then introduced in evidence a letter from said Clisby to them, dated April 9th, 1873 ;" which is made an exhibit to the bill of exceptions, and which, after acknowledging receipt of the telegram of April 8th, thus proceeds : "You are one-half to five-eighths under our market to-day. I can pick up small lots at $16\frac{5}{8}$ and 17, to $17\frac{1}{8}$, for full class. It seems to me that, at these prices, cotton is low enough ; but still there may not be any thing in it.   .   .   .   I think our 'st. g. ord.' is fully 'low mid.' with you, and 'g. ord.' your 'strict.'"   The defendants then introduced, also, the depositions of W. M. Greiner and L. M. Whilden, one of the defendants.   Greiner was a cotton-broker in Philadelphia, and testified, that he sampled and sold the fifty-four bales of cotton for the defendants, and that its quality was at least one grade below the original samples.   L. M. Whilden, who was one of the partners composing the defendants' firm, and through whom, as he stated, all the correspondence in reference to the fifty-four bales of cotton was conducted, thus testified in reference to it :   "Neither I individually, or as a member of said firm, nor the said defendants, at any time gave any authority to said Clisby to draw on them, on or about the 16th April, 1873, for any sum of money whatever. I know this fact, both from my own recollection, and from the defendants' correspondence with Clisby.   I recollect

sending a dispatch, on behalf of defendants, to said Clisby on the 8th April, 1873, in response to his inquiry, ' What would defendants advance on shipments of cotton?' in which I stated, that they would advance cost, if he would buy ' strict good ordinary' at sixteen cents, and ' low middlings' at sixteen and a half; but there was no authority given to Clisby to draw ; *and the prices given, on which defendants might advance, were only for that day ; and the defendants did not intend, nor propose, to make advances at all on lower grades of cotton, or on the grades mentioned at any other time : that is to say, a purchase was to be made on that date, and of the quality specified.* On the 16th April, defendants received a telegram from Clisby, proposing the purchase of one hundred bales, at sixteen and a quarter cents ; to which new proposition I replied, for defendants, both by letter and by telegram, on the same day, that such purchase then would result in a certain loss of $3.50 per bale ; but I gave him no authority to draw. On the 19th April, 1873, defendants received letters from Clisby, dated 14th and 15th April, advising them that he had shipped fifty-four bales of cotton for sale on his account, but no mention made therein of his having drawn against them. On receiving these letters, and on the same day, I, on behalf of defendants, both telegraphed and wrote to him not to draw within $10 per bale of the cost, the market having declined between the 8th and the 19th April. In authorizing him to draw within $10 per bale of cost, the defendants assumed that the grade of the cotton would correspond with the standard specified in their telegram of the 8th, and not until two days afterwards, on the 21st April, did they have any notice from Clisby that he had drawn any draft at all, and then no amount was stated. On the 21st April, defendants received from Clisby a letter, dated April 16th, eight days after date of our telegram, giving quotations, and inclosing invoice for said cotton, dated April 14th, consigned to them for sale on his account, and mention made, for the first time, of a draft drawn, but without stating amount. I, on behalf of defendants, replied to this letter on the same day, April 21st, intimating that a loss would occur on the shipment, and expressing the hope that a margin was left between the amount of the draft and the probable value of the cotton. On the next day, I, on behalf of defendants, again wrote to Clisby, inclosing the account of sales of his cotton of former shipments, showing a balance against him of $7,059.87 ; which result being more disastrous than defendants had anticipated, I, on behalf of defendants, notified him that they would not pay said draft ; and so I know, as I have already said, that there was no authority

given to Clisby to draw on the 16th April." The witness also admitted, in answer to another interrogatory, the receipt and sale of the cotton by the defendants, and the application of the proceeds of sale to the balance due to them from Clisby; but further stated that the cotton was below the grades specified in the telegram of 8th April.

The above quotation from Whilden's testimony is the principal part of his answer to the 4th direct interrogatory, which was in these words : " If, in answer to former interrogatories, you say that you negotiated said transaction, and wrote all letters and messages in relation thereto, then state whether or not, at any time, you, or said A. Whilden & Sons, gave any authority to said Clisby to draw on said defendants, on or about the 16th April, 1873, for any sum of money ; and if you say no such authority was given, state how you know that fact, and what connection you have with said firm, and what was your individual part of the business." " While said deposition was being read to the jury," the bill of exceptions states, " the plaintiff objected to that portion of the answer to the 4th interrogatory which " is italicized in the above extract, " because the same was not responsive to the question, and was otherwise illegal;" which motion the court granted, and excluded the evidence, and the defendants duly excepted. " The defendants then moved the court to exclude from the jury all that had been said by the witness Clisby, as to the grade or quality of said fifty-four bales of cotton bought by him as above stated; which motion the court refused to grant, and the defendants excepted."

" The foregoing being all the evidence, the court thereupon charged the jury, on the written request of the plaintiff, as follows : 'If the jury believe, from the evidence, that the defendants wrote to Clisby the letter of the 28th March, and sent him the telegram of April 8th, which had been read in evidence ; and that Clisby exhibited said telegram to plaintiff, and, on the faith of said authority and agreement of the defendants, made an arrangement with plaintiff to pay for said cotton ; and that the cotton was to be shipped to the defendants, who were to be compensated by commissions for selling said cotton ; and that by virtue of, and upon such authority and agreement of said defendants, Clisby bought fifty-four bales of cotton, and plaintiff paid for the same under said arrangement with Clisby, and on the faith of said authority and agreement of defendants; and that Clisby shipped the cotton to the defendants, and notified them thereof, and then drew upon them the bill of exchange, and informed them that he had drawn upon them, and delivered said bill of exchange, with the bill of lading for the cotton

thereunto attached, to the plaintiff; and that said draft, or bill of exchange, was for the amount of the cost of the cotton; and that the defendants refused to pay the costs of the cotton; and that the plaintiff thereupon notified them to hold said cotton on account of the plaintiff,—then the defendants were not authorized to sell said cotton, and appropriate the proceeds to the payment of Clisby's debt to them; and if they further find, from the evidence, that the defendants did sell said cotton, and appropriate the proceeds to the payment of Clisby's said debt, then the jury must find for the plaintiff.'

"The court also charged the jury, at the request in writing of the plaintiff, as follows: 'If the jury believe, from the evidence, that the defendants wrote to Clisby the letter of the 28th March, and sent him the telegram of the 8th April, read in evidence; and that Clisby made an arrangement with plaintiff, on the faith of said authority and agreement of defendants, to pay for said cotton; and that the cotton was to be shipped to the defendants, who were to be compensated by commissions for selling the same; and that said Clisby, by virtue of, and upon such authority and agreement of defendants, bought fifty-four bales of cotton, of the qualities, and at the prices named, and shipped said cotton, on the 16th April, 1873, to the defendants, and notified them thereof; and that the defendants promised to pay the costs of the same; and that under said arrangement with Clisby, and on the faith of said authority and agreement of said defendants, previously given and made, plaintiff paid for said cotton; and Clisby drew the bill of exchange read in evidence, and said bill was for the amount of the cost of the cotton, and delivered said bill to the plaintiff, with the bill of lading attached; and that the defendants refused to pay the cost of the cotton, and were then notified by plaintiff to hold said cotton on account of plaintiff; and that they sold said cotton, and appropriated the proceeds to their own benefit,—then the jury must find for the plaintiff.'"

The defendants duly excepted to each of these charges, and then requested several charges, which were in writing, and of which the following were refused:

1. "That the promise to pay drafts drawn against shipments of cotton, or to pay drafts drawn on any firm or person on any account, must be construed to mean to pay according to law, and that in such cases the drafts must be first presented for acceptance alone, and afterwards, upon the expiration of days of grace, for payment; and that if payment is demanded in the first instance, instead of acceptance, it may legally be refused, and, in such case, no action can be main-

tained against the drawee for not accepting, or for non-payment."

2. "That if the jury believe, from the evidence in this case, that the bill of exchange sued upon was presented for payment alone, the defendants are not liable thereon, and were justified in refusing payment."

3. "That the telegram of the 8th April, and the defendants' letters in evidence, are not such a promise as would charge the defendants as acceptors of said bill of exchange, in favor of the plaintiff, although the plaintiff took said bill on the faith of said telegram and letters."

4. "That if the defendants refused to accept and pay the bill of Clisby, when there was any legal obligation on them to accept and pay, the right of action against them, for such refusal, is in Clisby, and not in the holder of the dishonored bill."

5. "That the draft in evidence was not due until three days after presentment for acceptance, and demand of payment before then is without authority of law, and will not subject the drawee to an action thereon."

6. "That if the jury believe, from the evidence, that the plaintiff in this case is a corporation, doing business under the act of Congress of the United States passed June 3d, 1864, establishing the system of National Banks; and, while engaged in carrying on such banking business, advanced money to said Clisby to buy cotton, on the faith and credit of the said cotton, to be shipped by said Clisby, on his own account, to said defendants; and that said Clisby did purchase the cotton mentioned in the complaint, with said money, and did ship the same to defendants, and did attach the bill of lading therefor to said bill of exchange; and that defendants did not accept said bill of exchange; and that the only authority given by defendants to said Clisby, to draw on them, was the telegram dated April 8th, and the said letter of defendants read in evidence,—then the plaintiff can not recover in this action."

7. "That the plaintiff, being a national bank, could not legally advance money on the faith of the transfer of the cotton to it, and it can maintain no action on such transfer."

The defendants duly excepted to the refusal of each of these charges; and they now assign their refusal as error, together with the charges given at the instance of the plaintiff, and the several rulings of the court on the pleadings and evidence, as above stated.

GUNTER & BLAKEY, for appellants.—1. The demurrer to

the entire complaint was well taken, because there was a misjoinder of counts. A critical examination of the several special counts, rejecting much that is surplusage only, is necessary to ascertain their true character. All of them, except the 7th and 8th, are clearly *ex contractu;* while the 8th is entirely *ex delicto*, and the 7th may be so classed with less impropriety than as *ex contractu.* The misjoinder was good ground of demurrer to the entire complaint.—1 Brickell's Dig. 24.

2. The demurrers to the several counts were also well taken—in the first place, because they each seek, in violation of the statute (Rev. Code, §§ 1840–41), to charge the defendants as acceptors of a bill of exchange, without their acceptance being in writing, and without an unconditional promise to accept the particular bill before it was drawn. In most of the counts, the plaintiff's right of action is based on "a breach of promise to pay a certain bill of exchange;" and then certain facts are alleged, whereby it is alleged defendants "became bound to pay" said bill drawn on them; thus showing, though inartificially drawn, that they seek to charge the defendants as acceptors. In the case of *Kennedy v. Geddes & Co.*, 8 Porter, 263, before the enactment of any statute on the subject, this court approved and adopted the very stringent rule, announced by the Supreme Court of the United States, in the case of *Coolidge v. Payson* (2 Wheat. 61), and the subsequent case of *Boyce v. Edwards* (4 Peters, 121): that if the acceptance is not in writing on the bill, the collateral engagement, to amount to an acceptance, must be a promise to accept the particular bill, which must be described in terms not to be mistaken, and that the holder must have taken it on the faith of such promise. Thus the law was clearly defined and settled, without the aid of any statute; but, to place the matter beyond dispute, and to secure unmistakable evidence to charge the acceptor, the statute (Rev. Code, §§ 1840–41) enacts, that the acceptance must be in writing on the bill, or there must be an unconditional promise in writing to accept the particular bill before it is drawn.—*Sands & Co. v. Matthews, Finley & Co.*, 27 Ala. 401. This statute certainly can not be construed as relaxing the stringent rule formerly existing; and if effect is allowed to its terms, or to the former rule existing without its aid, the defendants could not be charged as acceptors, under the averments of any of these special counts except the last, which was not demurred to.

3. The case of *Smith & Ferguson v. Ledyard, Goldthwaite & Co.*, 49 Ala. 279, cited for appellees on this point, is unlike the case at bar, and is wrong in principle. In that case, the

first count was upon a breach of promise to accept; and the question presented was, whether the plaintiffs, as indorsees of the bill, could maintain an action, in their own name, on the promise to accept made by the defendants to the drawer; and it was held, erroneously (as we think), that this might be done. In the present case, there is no count upon the defendants' breach of promise to accept the bill, the point raised being on the sufficiency of the counts to charge them as acceptors. The distinction between the two cases is manifest, and is clearly stated in *Boyce v. Edwards*, 4 Peters, 122. But the case in 49 Ala. 279 is wrong in principle, in holding that the statute (Rev. Code, § 1843) gives any right of action to the indorsee, or holder of the bill of exchange, against the drawee, for not accepting the bill. The statute does not give any rights at all, but is simply a proviso to the preceding sections, and declares that they shall not be construed to defeat the existing right of any person, to whom a promise to accept a bill has been made, and who has negotiated the bill on the faith of such promise, to recover damages for the breach of such promise. If this statute can be construed to *give* a right of action, it can only be to the person *to whom* the promise to accept the bill was made, and who has negotiated the bill on the faith of that promise. And this brings the case to the next ground of demurrer specially assigned and insisted on—that these counts show a right of action, if any at all, in favor of Clisby.—9 Amer. Rep. 3; Story on Bills and Notes, § 462, note 2.

4. The first charge requested, and refused by the court, asserts that presentment for acceptance was necessary to fix the defendants' liability, before demand of payment was made. This raises the simple question, whether sight drafts are not entitled to days of grace; of which there seems to be no doubt.—Story on Bills, § 242, note 1; *Hart v. Smith*, 15 Ala. 807; *Nott v. Venable*, 42 Ala. 186. The second and fifth charges asked and refused present the same question, and the same authorities show the error in their refusal.

5. The third charge asked should have been given. The telegram and letter, whether taken singly or together, do not constitute such a promise as would charge the defendants as acceptors of the bill, though the plaintiff took the bill on the faith thereof. The telegram is conditional in several respects: it specifies particular grades and prices of cotton, and has reference to the then existing state of the market. These conditions are limitations upon the authority to draw, and are necessary when cotton is bought in one market, for shipment to and sale in another, to insure a margin between

the places.   The selling price being known, the buying limit
is fixed with reference thereto.   Every one must be held to
a knowledge of the ordinary import of words, and the com-
mon usages of trade; and the evidence shows very clearly
that Clisby understood the letter and telegram as imposing
these limitations.   Nor can the telegram, leaving out of view
the conditions contained in it, be regarded as a promise to
accept any bill whatever.   The promise might have been
complied with, by sending the money to Clisby by express,
or otherwise.

6.   The fourth charge asserts the principle raised by the
demurrers, that if there was any legal liability on defendants
to accept and pay the bill, the right of action for its breach
was in Clisby alone.—Authorities *supra*, par. 3.

7.   The affirmative charges, given at the instance of the
plaintiff, are well calculated to mislead, by blending together
distinct facts which have no necessary connection in any one
aspect of the case.   If the defendants are liable at all, they
must be liable as acceptors of the bill, or for a breach of
promise to accept, or for the tortious conversion of the cot-
ton; but these are separate and distinct matters, and the
facts necessary to establish the one have no bearing on the
others.   If the defendants are liable as acceptors, it is im-
material what became of the cotton; and if for the conver-
sion of the cotton, the bill of exchange was entirely irrele-
vant to the issue.   But the facts stated in these charges,
though improperly grouped together, do not authorize a
recovery in any aspect of the case.   The facts stated in the
first charge would not authorize a recovery for a conversion
of the cotton.   The cotton was shipped to defendants by
Clisby, without limitation or restriction, for sale on his
account.   The bill of lading, attached to the draft, was only
a duplicate of that which was forwarded to the defendants:
it was not a bill of lading to order, and did not control the
delivery of the cotton to the holder of the draft, nor create
any lien on the cotton in his favor; and the transfer of the
cotton by Clisby to the plaintiff, after the defendants had
received it, could not divest them of their lien for the gen-
eral balance due from Clisby, nor render them liable for a
conversion of the cotton if they so appropriated it.   Nor
does the charge state the facts necessary to charge the de-
fendants as acceptors: it does not require a compliance by
Clisby with the conditions of the telegram, as an element of
the defendants' liability; and the defendants could not, under
the statute (Rev. Code, §§ 1840–41); be charged as acceptors
on a conditional promise, such as contained in the telegram,
even though a compliance with the conditions be shown.

[Whilden & Sons v. Merchants' and Planters' National Bank.]

The record shows, too, in this connection, that the court charged the jury, on the request of the defendants, that they could not be made liable as acceptors of the bill. Nor does the charge state the facts necessary to render the defendants liable for a breach of promise to accept; in the first place, because (as the court afterwards instructed the jury) there is no count in the complaint on such breach of promise to accept; in the next place, because the promise, if any, is conditional; and, in the last place, no promise to accept is stated in the charge. The second affirmative charge is obnoxious to the same objections.

8. The charges asked and refused, as to the powers of the plaintiff as a national bank, are sustained by the following authorities : *Meckler v. First National Bank*, decided by the Maryland Court of Appeals, at April term, 1875 ; *Talmadge v. Pell*, 3 Selden, 328 ; *Fowler v. Scully*, 72 Penn. St. 456 ; 22 Ohio St. 516 ; *Wiley v. First National Bank of Brattleboro*, decided by the Supreme Court of Vermont, February, 1875 ; *First National Bank v. Ocean National Bank*, New York Court of Appeals, April, 1875.

9. The court erred, also, in admitting the supposed telegram of the defendants as evidence. This telegram was a written instrument, and was the very foundation of the plaintiff's right of action. The original writing should have been produced, or its absence accounted for, before secondary evidence of its contents could be received; and the original is the message in the handwriting of the sender, delivered to the telegraph company to be sent.—*Hawley v. Whipple*, 48 N. H. 487 ; *Durkee v. Railroad Company*, 29 Vermont, 127 ; 37 Miss. 682 ; *Matheson v. Noyes*, 25 Illinois, 591. Any other rule would make the sender of a dispatch liable for all the mistakes of the telegraph company and its employes. The fact that Peck testified that he had showed the paper to the defendants in Philadelphia, and that they admitted it was a correct copy of their telegram, does not change the rule of evidence.—*Fletcher v. Weisman*, 1 Ala. 602. The admission of Saville's evidence reversed this rule, and was equally erroneous. When it is sought to charge the receiver of a telegram with knowledge of its contents, the original message is not the one which is sent to him, but that which is delivered to him.—*Hawley v. Whipple*, 48 N. H. 487, and cases above cited. The rulings of the court reversed both of these rules; charging the defendants with a telegram which Clisby had received, and also with a telegram which Clisby had sent, without requiring the production of the original in either case.

10. What Clisby said about the quality of the cotton purchased by him, was hearsay evidence, and ought not to have

been admitted ; and Peck's evidence was not sufficient to connect the samples, which he saw in Philadelphia, with that which Clisby saw in his office at Montgomery, or that which he shipped to the defendants. The question is not, whether Peck furnished any evidence of the quality of the cotton, or what that evidence was worth ; it was, whether he testified to any fact which rendered Clisby's testimony admissible.

11. The bill of lading and the draft, when offered separately, and attached together, were inadmissible. The draft was not signed by the defendants, nor was any state of facts shown making it binding on them. The bill of lading was for cotton shipped by Clisby to defendants, not showing that plaintiff had any interest in it, or any connection with it ; and the fact that it and the draft were attached together did not change the legal effect of either or both of them, nor add to their relevancy. Nor could the relevancy and admissibility of these papers be affected by Clisby's testimony, as to the supposed custom in Montgomery to attach bills of lading to drafts so drawn. Such custom could not be received to change the legal effect of commercial instruments, such as bills of lading and bills of exchange.

12. Evidence of previous transactions between Clisby and defendants, though made through plaintiff's bank, was not relevant. Nothing in the complaint indicates any claim made on defendants, on account of any credit given by plaintiff to Clisby, based on the faith and confidence induced by defendants' former dealings with him. The former dealings between defendants and Clisby, whatever may have been their character, could have no effect on the defendants' liability as acceptors of this bill ; and the suit is not for damages for failing to accept.

13. The defendants' several letters after the 28th March, offered in evidence by the plaintiff, were all written after the transactions out of which this suit originated ; and they could not bind the defendants as acceptors of said bill, even though they had contained an unconditional promise to accept it.— 9 Amer. Rep. 1 ; 107 Mass. 37.

14. The testimony of Copeland ought not to have been admitted. The custom among cotton-buyers in Montgomery, to consider an order as binding until it was revoked, could not control or change the common-law rule as to what is a reasonable time, within which a commercial proposition must be accepted or declined. The order contained in the telegram, if it be an order, was subject to legal construction ; and such evidence could not be received to change that construction.

15.  The motion to suppress a portion of Whilden's deposition came too late.—*Park v. Wooten*, 35 Ala. 242; *Nelson v. Iverson*, 24 Ala. 9.

SAYRE & GRAVES, and D. CLOPTON, *contra.*—1.  The whole theory of the complaint is, that Clisby, acting under authority given him by the defendants, purchased certain cottons, and that the plaintiff, acting on the faith of that authority, advanced to him the money to pay for the cotton, and took his draft on the defendants for the amount so advanced, with the bill of lading for the cotton attached; in other words, that the defendants promised to pay any one who, according to usage in Montgomery, would advance to Clisby, for them, the money necessary to buy the cotton he was authorized by them to buy.  They had no money in Montgomery, and they knew that some one there must advance to Clisby the money to pay for the cotton.  The first count is on the breach of promise to pay the bill, not on the bill itself; and it sets out the breach, and claims damages for such breach.  The fifth count sets out the same preliminary facts, and the additional fact that the defendants had appropriated the proceeds of the cotton to their own use; thus showing a ratification of the whole transaction by the defendants, even if there was no previous authority.  The sixth count is for the money advanced by plaintiff to buy the cotton; the seventh, on the breach of promise; the eighth, to recover the money advanced to pay for the cotton; and the ninth seeks to charge the defendants as acceptors.  The counts are all *ex contractu*, and only vary the form of the allegations as to the same facts.

2.  The case falls within the exact terms of the statute (Code, § 2102)—"an unconditional promise in writing to accept a bill before it is drawn," which, as the statute declares, "amounts to an actual acceptance." No other construction can be placed on the language of the letter and the telegram, than that Clisby was authorized to draw on them for the cost of the cotton he might purchase, and, of course, draw in favor of any one who might advance the money to him.  Such transactions are of frequent occurrence, and are well known in the commercial world.— *Ulster Bank v. McFarland*, 5 Hill, 432; *Smith & Ferguson v. Goldthwaite, Ledyard & Co.*, 49 Ala. 279.

3.  Presentment for acceptance is not necessary to bind the drawee, though required to bind the drawer and indorser. Besides, the defendants had already notified the drawer that they would not accept, which dispensed with any formal presentment; and their promise to pay the bill, in their letter

of April 21st, was a waiver of any right to presentment for acceptance. Moreover, the question must be determined by the laws of Pennsylvania; as to which, there is no evidence. That the commercial law on the point is not definitely settled, see 1 Parsons on Notes and Bills, 30–4. In addition to this, Peck proves a demand and refusal of payment long after they had sight of the bill.

4. There is no error in the various rulings of the court on the evidence. Under the facts stated by Peck, there was no necessity for introducing the telegram to Clisby at all, since the defendants admitted its contents.—*Paysant v. Ware*, 1 Ala. 17. But it is insisted that the telegram received by Clisby was the original. Before the invention of telegraphy, there could be but one original message, and its proper custodian could be readily ascertained, and compelled to produce it; or, if he was beyond the jurisdiction of the court, secondary evidence of its contents was received. But, by the regulations of telegraph companies, which are necessary to the proper conduct of their business, and of which courts will take judicial notice (*Salomon v. The State*, 28 Ala. 88), the original dispatch is never delivered to any one unless its production is compelled by judicial process. Here, the original and its custodian were beyond the jurisdiction of the court, and could not be reached by any legal process; and the evidence adduced was the best that could be had.—Jarnagin & Scott on Telegraphs, § 347. That the testimony of Copeland was properly admitted, see *Boon & Co. v. Belfast*, 40 Ala. 187. The admission of Saville's testimony, if erroneous, could have worked no injury, since the defendants admitted the receipt of the telegrams to which he testified. That portion of Whilden's testimony which was excluded, if not responsive to the interrogatory, was irrelevant and illegal, and might be excluded at any stage of the cause.—1 Brickell's Digest, 887, § 1180.

BRICKELL, C. J.—The statute provides, that all actions on contracts, express or implied, for the payment of money, whether under seal or not, may be united.—Code of 1876, § 2986. By the common law, the rule in reference to the joinder in the same declaration of diff rent causes of action, applicable alike to actions *ex contractu* and actions *ex delicto*, was, that the same plea could be pleaded, and the same judgment could be given on each count; or the counts must have been of the *same nature*, and the same judgment capable of being rendered on all, though the pleas to each were different.—1 Chit. Pl. 222. Under the statute, it is the *nature* of the cause of action—contracts, express or implied, for the

payment of money, whether under seal or not—which is the criterion, by which the propriety of the joinder is to be determined. The statute applies only to actions upon contracts, and has no reference to actions *ex delicto.* The rule of the common law, that counts *ex contractu* can not be joined with counts *ex delicto,* is unchanged; and such joinder, if taken advantage of by demurrer to the entire complaint, assigning it as the specific cause, is fatal, though each count is in itself unobjectionable.—*Walker v. M. D. & F. Ins. Co.,* 31 Ala. 529; *Shotwell v. Gilkey, Ib.* 724.

When a party has an election, on the same facts, to sue in tort or contract, under our statutory system of pleading, it is often matter of unmixed difficulty to determine whether a particular count is to be regarded as in form *ex contractu* or *ex delicto.* A common carrier may be sued, for a breach of the contract to carry and deliver safely, or in case for a neglect of the duty resting upon him, or, sometimes, in trover for a conversion. If the contract is stated, the question arises, whether it is stated as matter of inducement, or whether it is intended to count upon its breach. The facts averred would be substantially the same. So, when a party has the right of waiving the tortious conversion by sale of his goods, and suing as upon an implied contract for money had and received. The common count in assumpsit, if he waives the tort, would be generally sufficient. But he may deem it necessary to unite a special count, averring the particular facts. This, of course, would embody every fact he would be bound to prove in an action of trover for the conversion, except the value of the goods; of which, the price for which they sold would be admissible evidence. It is from the facts stated in the body of the count, the question must be determined; and when these indicate that the plaintiff is proceeding for a measure of recovery adapted only to the one form of action, it must be intended that the count belongs to that form of action, whether it is *ex delicto* or *ex contractu.*

The seventh and eighth counts only are supposed by the argument, and insisted on by the counsel for the appellants, as being in tort, and creating a misjoinder. Stripping these counts of much irrelevant matter, rendering them prolix, and embarrassing their construction, the *gravamen* alleged in each is the wrongful sale of the cotton, with the knowledge, on the part of the defendants, that it had been transferred to the plaintiff, and the refusal, on request, to pay plaintiff the proceeds of sale. The owner of goods, if a wrong-doer by sale converts them into money, or into that which is received as the price and the equivalent of money, may waive

the tort, and recover the money or the price.—*Fuller v. Duren*, 36 Ala. 73. The recovery would be limited to the price received, or agreed upon, without regard to the value of the goods; while, if he sued in trover for the conversion, the value of the goods, whatever may have been the price for which they were sold, would be the measure of damages. These counts, claiming to recover only the proceeds of the sale of the cotton, and deducing the liability of the defendants from the failure and refusal to pay them to the plaintiff, are *ex contractu*, and not *ex delicto*.

It is insisted in support of the demurrer to the first, fifth, and sixth counts, that they seek to charge the defendants, either as acceptors of the bill drawn by Clisby, or upon a promise to accept it, made before it was drawn; and it is not averred the acceptance was in writing, or that the promise to accept was in writing, and unconditional. By the law-merchant, in the absence of a statute otherwise providing, an oral acceptance of a bill of exchange will bind the acceptor. A recent writer has thus expressed the result of the authorities: "According to the law-merchant, an acceptance may be (1) *expressed* in words; or (2) *implied* from the conduct of the drawee. (3) It may be *verbal*, or *written*. (4) It may be in writing, *on the bill* itself, or on *a separate paper ;* and a telegram has been held to be a sufficient acceptance. (5) It may be *before* the bill is drawn, or *afterwards*."—1 Dan. Neg. Ins. 371. As to the effect of a mere verbal promise to accept a non-existing bill, communicated to, and upon the faith of which the holder was induced to take it, there is a contrariety of decision in the courts of this country. The conflict is rather as to the effect, than as to the validity of the promise. In *Kennedy v. Geddes*, 8 Port. 263, a general, indefinite, verbal promise to accept, made to the person taking a bill subsequently drawn, was held not to amount to, and incapable of being declared upon as, an actual acceptance of a particular bill. The case returned to this court, the declaration having been amended by adding a count upon the promise. The court recognized the distinction, stated in *Boyce v. Edwards*, 4 Pet. 122, "between an action on a bill, as an accepted bill, and one founded on a breach of promise to accept," &c. "The evidence necessary to support the one or the other, is materially different. To maintain the former, the promise must be applied to the particular bill alleged in the declaration to have been accepted. In the latter, the evidence may be of a more general character, and the authority to draw may be collected from the circumstances, and extended to all bills coming fairly within the scope of the promise." The acceptor of a bill of exchange, as between the several parties

to it, drawer, payee, indorser, and indorsee, *prima facie* is the party primarily liable. His engagement to accept is not a promise to answer for the debt, default, or miscarriage of another, but to assume only his own separate, independent liability, for which the drawer promises to answer, if he makes default, and notice of the default is given; and the indorser promises to answer, if acceptor and maker are in default, and he has notice.—*Kennedy v. Geddes,* 3 Ala. 581.

The statute has declared since, that an acceptance of a bill of exchange, unless it is to be implied from facts not entering into the present case, must be in writing, signed ·by the acceptor, or his agent; and that an unconditional promise, in writing, to accept a bill, before it is drawn, amounts to an actual acceptance.—Code of 1876, §§ 2101–02. These statutes may now render invalid all verbal acceptances of bills, and verbal promises to accept non-existing bills, except in favor of a party who, on the faith of such promise, has negotiated a bill, and whose rights are saved, as they exist under the law-merchant, by a subsequent section of the Code.— Code of 1876, § 2104. But as, under the law-merchant, a verbal acceptance, or a verbal promise to accept a non-existing bill, was valid, the operation of the statutes is directed to the *form* ·of the contract. The rule of pleading, recognized by the authorities, is, that where a verbal contract is valid in the absence of statutory inhibition, it is not necessary, in declaring upon a contract of that kind, to aver whether it was written or unwritten. The statute intervening, and pronouncing it invalid if not in writing, upon a proper issue being formed, the plaintiff will fail, unless it is shown to have been written.—1 Chit. Pl. 244; *Chalie v. Belshaw,* 6 Bing. 529. The rule has been often recognized in this court, in reference to contracts within the statute of frauds.—*Brown v. Adams,* 1 Stew. 51; *Rigsby v. Norwood,* 34 Ala. 129. The form of complaint prescribed by the Code, for an action against the acceptor of a bill of exchange, contains a mere general averment that the bill was accepted, not stating that the acceptance was in writing, and is in tacit recognition of the rule.

An acceptance of a bill of exchange, if written upon it, becomes a part of the instrument itself, and is binding according to its legal terms and effect, in favor of all prior or subsequent parties; or, if it be by a separate writing, or (under the law-merchant) if verbal, it has the same operation as if it were written formally on the face of the bill.—2 Am. Lead. Cases, 318. A collateral, a separate, independent promise to accept a non-existing bill, may not amount to an actual acceptance; but, when it is communicated to a par-

ticular person, who, upon the faith of it, takes a bill to which it is applicable, and which is fairly within the scope of the promise, he is entitled to the benefits of such promise, and may in his own name maintain an action thereon; upon the same principle, that whoever draws bills, or makes advances, upon a general letter of credit, has a direct, immediate remedy in his own name, against the writer of the letter.— *Boyce v. Edwards*, 4 Pet. 111; *Barney v. Newcomb*, 9 Cush. 46; *Pollock v. Helm*, 54 Miss. 1; *Russell v. Wiggin*, 2 Story, 213; *Murdock v. Mills*, 11 Metc. 6; *Carnegie v. Morrison*, 2 Metc. 6; *Ferguson v. Ledyard*, 49 Ala. 279. It is not necessary to notice further the demurrers; for, without departing from the principles settled in the authorities to which we have referred, they could not have been sustained.

We pass to such of the assignments of error relating to the admissibility of evidence, as are insisted upon in the argument of appellants' counsel. The first is in regard to the telegram purporting to be signed by the appellants, addressed to Clisby. The general principle is, as insisted on by appellants' counsel, that a party is bound to produce the best evidence within his power, of which a fact is capable; and that whenever the original of a writing can be produced, secondary evidence of its contents will not be received; and is as applicable to telegrams as to any other writing.—1 Whart. Ev. 576. There is some difficulty in determining whether the message delivered to a telegraphic office, or that which is delivered to the person to whom it may be addressed at the point of destination, is to be regarded as the original. Perhaps, under some circumstances, the one or the other may be considered the original. It is not now necessary to enter on that inquiry. If the message as it was delivered to, and may be preserved in the office of the telegraph company at Philadelphia, is to be regarded as the original, it was without the jurisdiction of the court, as was its custodian. It is a settled rule of evidence in this country, that if writings, necessary as evidence in a court of one State, are in the custody of persons residing in another, secondary evidence of their contents will be received.— *Burton v. Driggs*, 20 Wall. 134; *Beattie v. Hilliard*, 55 New Hamp. 428; *Binney v. Russell*, 109 Mass. 55; *Shorter v. Sheppard*, 33 Ala. 648; 1 Whart. Ev. § 130. Not only was the original—taking the view of appellants' counsel as to which paper was to be regarded as the original—without the State, but the appellants had voluntarily admitted to Peck the genuineness of the dispatch offered in evidence, and the admission entitled it to be received.—2 Whart. Ev. §§ 1091-3.

The evidence of Saville was simply redundant, or super-

fluous. The telegrams, in relation to which he testified, were properly admitted, in connection with the evidence of Peck, that he had showed them to appellants, and they had admitted their genuineness. It is, at most, error without injury, to receive illegal evidence which is merely redundant.—*Bishop v. Blair*, 36 Ala. 80; *Jemison v. Dearing*, 41 Ala. 283.

If it was material that it should have been shown the cotton purchased by Clisby was of the quality he was authorized to purchase, we can perceive no sound objection to his evidence in reference to the samples sent the appellants, when taken in connection with the evidence of Peck, that they were exhibited to him by the appellants, accompanied by the tacit admission that they were of the quality of the cotton Clisby had shipped them. The bill of lading and draft were parts of the transaction the suit involves, and there was no error in admitting them in evidence. Nor can we see that there was error, in receiving evidence of previous transactions between Clisby, the appellants, and the appellee. The course of dealing, or of business between parties, in similar transactions, is usually received, as furnishing the basis of a presumption that it was intended to be observed, save so far as by agreement they may have departed from it, in the transaction in controversy.—*McKenzie v. Stevens*, 19 Ala. 691. The evidence of the custom with cotton-buyers in Montgomery, to regard an order to purchase at particular prices of force until revoked, was redundant. Whether such a custom can be regarded as valid, enlarging indefinitely the authority given by the principal, we do not now consider. There is no controversy about the fact that the cotton was purchased by Clisby, shipped to and received by defendants, without objection by them as to the time of filling the order. Acquiescence in, and ratification of the purchase, so far as time was a material element, must, then, be imputed to them.

It is certainly true, that a motion to suppress the answer of a witness whose deposition is taken, on the ground that it is not responsive to the interrogatory, must be made before the trial is commenced, and can not be entertained during its progress.—*Park v. Wooten*, 35 Ala. 242; *Nelson v. Iverson*, 24 Ala. 9. But the objection to that portion of the answer of the witness, Whilden, which was excluded, was not rested solely upon the ground that it was irresponsive, but also upon the ground that it was "*otherwise illegal.*" Its inadmissibility and illegality are apparent upon its face; and the practice is well settled, that illegal, irrelevant evidence, may be assailed by a general objection, and excluded at any stage of the proceedings.—1 Brick. Dig. 887, §§ 1189–90.

It may be, the charges requested by the appellees, group-

ing all the facts tending to establish a right of recovery, in either of the aspects in which the case was presented by the special counts of the complaint, are so framed that the jury may have been confused and mislead, and could without error have been refused. The giving such charges, when they do not assert incorrect legal propositions, rests largely in the discretion of the primary court, and will not avail to reverse the judgment. The party apprehending injury from them, must request explanatory charges, curing their tendency to confuse and mislead.—1 Brick. Dig. 344, §§ 129–30.

A specific objection to the first of these charges is, that it asserts the appellee had a right of recovery, though the cotton purchased by Clisby may not have been of the grade or quality specified in the telegram of appellants to him, and though purchased at a higher price than that specified. The second charge is assailed, because it is silent as to the time of Clisby's purchase. It was not incumbent on the appellee to inquire whether the cotton was of the quality, or had been purchased at the prices specified. These were matters submitted to Clisby's judgment and discretion; and for his fidelity and diligence in reference to them, he is responsible to the appellants. When he proposed drawing on the appellants, for the money to pay for the cotton, the act was a representation to third persons, dealing with him in good faith, that the cotton was of the quality and cost he was authorized to purchase. Upon this representation the appellee had the right to rely. It was of facts necessarily and peculiarly within his knowledge, and binds the appellants, as the admissions of an agent, while executing his authority, bind the principal.—Wharton on Agency, § 158, n. c. §§ 256–263.

The question of importance, presented by the instructions requested by the appellants, is, whether the letter and telegram of appellants, upon the faith of which the fifth of these instructions admit the bill was purchased by the appellee, are, within the meaning of our statute, an unconditional promise in writing to accept a bill before it was drawn, which can be enforced. Upon this question we have not doubted. No form of words, no particular expressions, are necessary to constitute an acceptance of a bill of exchange. A promise to *pay*, to *honor*, or to *settle*, or any declaration by the drawees indicating plainly the intention to comply with the request of the drawer, has been deemed sufficient to constitute an acceptance, when the acceptance could be made orally. The statute requiring that it shall be made in writing, simply changes the mode of proof, without changing otherwise this rule, and the words or expressions which would constitute an *oral*, will constitute an acceptance in writing. Nor are any

particular phrases necessary to constitute a promise to accept. Whatever form of words may be employed, if, when fairly interpreted, they manifest clearly a promise to accept a bill thereafter to be drawn—an *absolute*, as distinguished from a *conditional* promise—satisfies the statute.

The promises are in writing; first in the letter, that if the appellants, on being informed of the price of cotton, saw a margin, they would authorize Clisby to draw for the cost. Then, after being informed of the prices, the promise by telegram is to *advance the cost*. The language of the letter and telegram will not admit of any other just interpretation, than as conferring authority upon Clisby to draw on the appellants for the money to purchase cotton of the quality and at the prices specified.—*Bank of Michigan v. Ely*, 17 Wend. 508; *Ulster County Bank v. McFarlan*, 5 Hill, 432; *Johnson v. Clark*, 39 N. Y. 216. It would be thus read and understood by the commercial world, who were invited and expected to deal with Clisby upon the faith of it. The terms of the writing are absolute, not conditional. Cotton of a particular quality is to be purchased, at a particular price. This is, however, a matter which is referred to the judgment and determination of Clisby, and not to the judgment and determination of those dealing with him. If upon them was cast the duty of supervising his conduct in this respect—if they could not rely on his representations—the authority would not avail for the purpose for which it was given. There would be but few, if any, who would act upon it, if it was at the peril of being responsible for his judgment and determination in reference to the quality and price of cotton. If he has abused the discretion committed to him by the appellants, they must look to him for indemnity. Their obligation to the appellee can not be avoided, unless notice of his indiscretion was imputable, of which there is no pretense.—*Bank of Michigan v. Ely, supra.* Standing in the relation of acceptors, the appellants were the principal debtors; and no presentment for payment, or for acceptance, was necessary to fix their liability.

Charges requested, based partly or entirely on a state of facts of which there does not appear to have been evidence, are abstract, and should be refused.—1 Brick. Dig. 338, § 40. We do not understand from the evidence that the appellee advanced Clisby money to purchase cotton, relying upon the cotton as security. The money was advanced upon the bill of exchange, and upon the faith of appellants' promise to accept and pay it. Whatever right or interest in the cotton may have been claimed by the appellee, was under an arrange-

[Smith et al. v. Wert and Wife.]

ment with Clisby subsequent to the refusal of the appellants to pay the bill, and was intended to secure its payment.

We have considered each of the numerous assignments of errors, and have but to add, that the judgment must be affirmed.